In re EQUITABLE OFFICE BLDG.
CORPORATION.
No. 78476.

United States District Court
S. D. New York.
Jan. 7, 1949.

Olin, Murphy & Redmond, of New York City, pro se and as Attys. for Empire Trust Co.

McDermott, Turner & Hart, of New York City, for Depositary Empire Trust Co.

Gerdes & Montgomery, of New York City, for Wertheim & Co. and other debenture holders.

Hardy, Stancliffe & Hardy, of New York City, for Sterling, Grace & Co. and other debenture holders.

Emanuel Redfield, of New York City, for debenture holders Frank and Lichtenstein.

Scribner & Miller, of New York City, pro se and as Attys. for Amott Committee and Douglas Vought.

Wagner, Quillinan, Wagner & Tennant and Tachna & Pinkussohn, all of New York City, pro se and as Attys. for Granger Committee.

Brower, Brill, Ennis & Gangel, of New York City, pro se and as Attys. for 120 Broadway Committee.

Wickes, Riddell, Bloomer, Jacobi & McGuire, of New York City, pro se and as Attys. for Stockholders' Committee and for Blake Snyder.

Reeves, Todd, Ely & Beaty, of New York City, for Louis B. Altreuter.

T. Roland Berner, of New York City, pro se and as Atty. for Adelaide H. Knight and William P. Doyle.

Aranow, Brodsky, Einhorn & Dann, of New York City, for Horowitz, Abrons and other Stockholders.

Herman B. Zipser, of New York City, for Jacob Beyer, stockholder.

Simpson, Thacher & Bartlett, of New York City, for Brooks, Harvey & Co., Inc. and Urban Servicing Co.

Greenbaum, Wolff & Ernst, of New York City, for Sydney Bernheim.

Douglass Newman, of New York City, for Equitable Office Bldg. Corporation.

Sherpick, Gilbert, Regan & Davis, of New York City, for Thomas E. Huser.

Buchter, Rathheim, Abrams & Holz, of New York City, for Robert H. Armstrong.

Carb, Reichman & Luria, of New York City, for George A. Hammer, Walter A. Cashel, H. S. Ford and O. J. Gette.

Henry S. Hooker, of New York City, and McNamara & Seymour, Associate Attys. of New York City, for trustee.

KNOX, Chief Judge.

The debtor in this proceeding owns the land and building at 120 Broadway in downtown Manhattan, one of the world's most valuable office building properties. A voluntary petition in reorganization was filed in April, 1941, and it was only after six long years that a plan of reorganization was finally consummated. The details of the proceeding are so fully described in the discussion of the several applications that no useful purpose would be served by repeating them here.

One introductory observation should be made: Counsel for the Debtor has stated that the net current assets as at February 29, 1948 total $1,077,606.50. This is the net remaining after payment of $178,000 by way of allowances made prior to that date. If I were to follow the S.E.C.'s recommendation on the final hearing for allowances, the total allowances and disbursements would be $672,102.91. Those granted by me total $792,521.57. These figures include allowances made prior to February 29, 1948 in the sum of $178,000. Since that date, under the order of August 31, 1948, allowances and disbursements have been paid in the sum of $303,955.57. In other words, of the total of $792,521.58

allowed by me $481,955.57 have already been paid, leaving a balance of $310,566.01 to be paid in accordance with this opinion.

If an appeal should be taken by the applicant representing William Doyle and Adelaide Knight from the denial of any compensation to him, and that appeal should be upheld, he would be allowed in all probability a substantial fee. In that event, other allowances possibly would have to undergo revision. Should an appeal be taken, the court will give consideration to what if anything should be done pending appeal.

Application of J. Donald Duncan.

J. Donald Duncan, disinterested Trustee herein, entered upon his duties on April 10, 1941, and continued to perform them until the consummation of the reorganization now in effect. He requests that his compensation be fixed at $200,000. He has heretofore received the sum of $95,000, which, of course, will be credited upon the fee about to be determined.

The Securities and Exchange Commission expressed the view that Mr. Duncan's compensation should not exceed $125,000, or approximately $17,850 per annum.

Throughout this administration, the disinterested trustee has devoted himself to the complicated and intricate problems that continued constantly to come before him. He did so with energy, intelligence and complete fidelity to all concerned. The character of his services has given me personal satisfaction and what he has done has been of incalculable aid to the Court. His comprehension and understanding of the matters involved in this administration were at the disposal, at all times, of the parties in interest and they made free and full use of the information that was needed for their enlightenment. With one exception, these interests, I think, will freely admit that petitioner was uniformly courteous and considerate and that he was impeccable in the way of fairness and impartiality. Such, at any rate, is my firm conviction.

Such, too, seems to be the conviction of the Commission. As illustrative of this, I quote from the statement made by Mr. Finnigan:

"As I said * * * Mr. Duncan did not sit back and let other people run the property, but he personally took over and, as I said metaphorically, he rolled up his sleeves, and really did a job. * * *

* * * * * *

"I think that it would be unfair * * * not to make several points. In the first place, I have already referred to the obviously successful negotiations with the City on the question of the tax certiorari proceedings. However, I have not pointed out that the mortgage which I have extolled of $14,500,000 was obtained ultimately by Mr. Duncan. There is no question that he was the man who was up there * * * at the John Hancock Mutual Life Insurance Company, and there is no question either that throughout the proceedings, Mr. Duncan had been urging upon everybody that the way to reorganize * * * was to get the funded debt down to where there could be no danger of catastrophe if business fell off.

"There were other things in connection with Mr. Duncan's operation of the property, and one of them was the very tender subject of relations with the labor unions. I do not recall the exact facts, but at the beginning of the proceeding the union had not taken over all the service employees of the building. There were I think one or two unions in there, but a lot of the employees were not members of the union. Since these proceedings, they have all joined, and your Honor will recall what the Major (Hooker) refers to as the time no one now living will forget when all the buildings were all tied up with elevator strikes, and Equitable was not.

"Relations as far as we have been able to ascertain between the unions and the present management * * * have been excellent * * * and I think that a great deal of the credit for that spirit of relations goes to the trustee and his counsel, and to the additional trustee. I think that is a very fine thing.

"The first two plans were proposed by Mr. Duncan after consultation and a lot of conferences with the various interested parties, as to some of which Mr. Riddell was hurt because he was not invited to attend. However, these were not laid down on the desk by Mr. Duncan with the attitude 'This is my idea; take it or leave it.'

"A great deal of time was spent in trying to work things out so that when things were brought to the attention of the Court, they would be agreeable to practically everybody and there would be no prolonged litigation. Obviously, he could not (always) do it in view of his sincere feelings, which I need not point out, the S.E.C. shared and supported, that there was no equity for the stock * * *

* * * * * *

"I have mentioned that Mr. Duncan very seriously took over the duties of operating the property, and that is I think illustrated in connection with the larger leases that he personally handled. For example, I am sure he has incurred some life long enemies in the case of some of the officials of the Bankers Club, * * * but he assumed or he felt that it was his duty to do the best he could in getting these tenants to pay up, and I feel he has done so.

"Certainly the record of the percentage of rentals and the foot rental per square foot indicates that he has done a good job. However, * * * we cannot lose sight of the fact that this is a reorganization proceeding, and that persons are not paid in reorganization proceedings on the same basis as they are paid in private practice."

On the basis of this last premise, Mr. Finnigan expressed the thought that the Trustee's compensation should not exceed $125,000.

From the foregoing recital of the scope and skill of Mr. Duncan's contribution to these proceedings, it is apparent that he is a man of initiative and executive capacity, and one who shirked no responsibility. Such qualities, when displayed in or out of a reorganization proceeding, have a value which must be recognized, and, in my opinion, an allowance of $125,000 would not do this adequately. This is particularly true when account is taken of the fact that, for seven years, Mr. Duncan has had to carry his share of his office overhead, and that the time he has given to this administration, has deprived him of the opportunity of devoting his talents to far more

lucrative employment. After the demonstration of the capacity that the Trustee has here shown, and having before me the knowledge that he has been charged with the responsibility of handling almost $30,-000,000 of the debtor's funds, I would feel myself to be both niggardly and parsimonious if I were to award him less than $175,-000 or about $25,000 per year. His fee is fixed at $175.000. Disbursements of $232.71 have already been paid.

### Application of Harry E. Miller.

Throughout the years that this proceeding has been in court, this applicant has served as the Additional Trustee of the debtor. For services thus performed he has received an annual salary of $15,000. From 1938, until the day on which the petition for reorganization was filed, Mr. Miller served as the debtor's President and Treasurer. In this dual capacity, he was paid a salary of $15,000 per annum.

For many years prior to 1938, in fact since 1921, petitioner was an officer of the debtor. Over this period of time, he became intimately acquainted with all the details of management of an enormous enterprise. It is fair to say, I think, that his knowledge of the necessities of the Equitable Office Building Corporation is probably superior to that of any other person.

Since the initiation of this proceeding, that knowledge has been at the free disposal of the disinterested trustee, the parties immediately concerned, the Securities and Exchange Commission, and the Court. Without his wisdom, experience and integrity, the administration would have been one of extreme difficulty. If inquiry were to be made of those who have had occasion to discuss the affairs of the debtor with Mr. Miller, I think it probable that each of them would say that his services have been invaluable.

Notwithstanding all this, the income of Mr. Miller has remained static. In the meanwhile, the wages of elevator operators, charwomen, mechanics, engineers, carpenters and other employees of the building have been substantially increased, one or more times.

Now that the debtor has been reorganized, it is appropriate that Mr. Miller's contribution to that result be recognized. He requests a supplemental allowance of $35,-000. The Securities and Exchange Commission, while it concedes that this applicant "worked nights and he worked Saturdays and Sundays on occasions, because whenever one asked him for a figure or a chart, or schedule, one got it," and that, due to his ingenuity, he saved this estate something like $5,500 a year, thinks that the compensation now payable to Mr. Miller should not exceed $10,000.

This sum, in my judgment, is inadequate. If during the administration, the Trustee had requested me to authorize the payment to Mr. Miller of a salary in excess of $15,-000 per year, I have no doubt that the request would have been granted. I think, therefore, that in justice to Mr. Miller, the least that I can do in the way of recognition of his work is to allow him $15,000.

### Application of Henry S. Hooker, Attorney for the Trustees.

In the performance of the services for which Major Hooker now seeks compensation, he and his associates consumed approximately 10,596 hours. The work performed was not only voluminous, but intricate, involved, highly technical, and, in some respects, novel. By this I mean that the attorney for the trustee was required, due to the war, to deal with numerous governmental agencies whose requirements and exactions increased his burdens far beyond the ones that otherwise would have been imposed upon him.

In addition to this, he was confronted by the necessity of dealing with the problems of union labor; and also with matters of taxation that were of vital importance to the debtor. Notwithstanding my familiarity with the proceeding, a perusal of Major Hooker's petition recalls to mind details of his activities that I had forgotten but which, looked at in retrospect, are amazing in scope, and impressive in their intricacy, complexity and importance.

Directly, or indirectly, through the activities of this petitioner, large sums of money accrued to the debtor's estate, or were saved from dissipation. Included therein are tax refunds from both the city and federal governments, recoveries from

defaulting tenants, and the elimination of labor claims which, had they been sustained, would have aggregated the expenditure of something like $200,000.

That these services were well performed and deserve substantial compensation, there can be no doubt. Petitioner requests an allowance of $300,000. The Securities and Exchange Commission believes that the amount is excessive for the size of the estate (say $23,000,000 to $25,000,000) and that many of the services performed were of a routine nature and the maximum reasonable fee should not exceed $175,000. In my judgment, the total compensation of this petitioner should be fixed at $200,000, plus disbursements of $202.24. Petitioner has heretofore received as compensation the sum of $135,000 which amount of course, will be credited upon his fee as above determined. His disbursements have already been paid.

### Application of McNamara & Seymour, as attorneys for the Debtor.

For a period of more than fifteen years prior to the date on which this proceeding was instituted, these petitioners were attorneys for the debtor.

When the necessity for filing a petition under Chapter X became apparent, these applicants arranged for a special meeting of the debtor's directorate, and for the adoption of a resolution approving of the action under contemplation. Thereupon, they prepared the petition and submitted it to the Court. It was approved, and Trustees of the Debtor were appointed.

Upon this event, they arranged for the bonds required of the trustees, sent appropriate notices to all parties in interest, conferred with a number of them, and apprised the Trustees of many of the problems confronting them. From time to time thereafter, petitioners conferred with counsel for the Trustees, and also with counsel for Committees representing debenture holders and stockholders. They kept in touch with the progress of the administration, and gave attention to the details of the plan of reorganization submitted by the Trustees, as well as its modifications. Upon occasion, as the administration progressed, they gave expression of their views with respect to matters of fact and of law that demanded judicial scrutiny. Without the slightest intention of minimizing the practical value of these activities, candor requires me to say that many of these services, while helpful to the parties in interest, were of a more or less routine nature.

When Mr. Berner became an active participant in the proceedings, and it became clear that there was a substantial possibility of saving most of the equity in the debtor's property for the benefit of stockholders, petitioners took a lively part in seeking to upset the 1946 plan of reorganization. In their efforts to achieve this objective, they became prominent actors in the litigation that followed, and which, from the standpoint of stockholders, as all of us know, and due to all persons who sought the accomplishment, was highly successful.

Petitioners now ask that they receive $26,000 for services performed on behalf of the debtor, and that they be reimbursed for expenses incurred in the sum of $939.53. The time consumption in performing the work of this firm of attorneys was approximately 13,000 hours. They value this work at about $20 per hour.

The Commission, while it approves the disbursement item claimed by petitioners, and although it says that what they did was helpful and beneficial from the standpoint of stockholders, and that "they worked hard, and that the proposals they made were sufficiently involved to require a good deal of study in a limited time and under pressure" is of opinion that their compensation should not exceed $7,500.

In view of the fact that McNamara & Seymour filed the petition herein, and were of undoubted help to the various parties in the way of advising them in regard to the debtor's prior history, and inasmuch as they vigorously asserted themselves in the successful effort to overthrow the 1946 plan of reorganization, I think that the Commission's estimate of the value of their services is too low. I shall fix their compensation at $15,000. They have, heretofore, received their disbursements, and have had $7,500 on account of their fee. They will be paid the additional sum of $7,500.

### Application of McNamara & Seymour for services rendered as associate attorneys for the Trustee.

█ As pointed out above, this firm of attorneys for many years prior to the filing of the petition in this proceeding, was the attorney for the debtor. Following the onset of the administration, there were numerous matters then pending, and others to be begun, with which these petitioners were intimately acquainted. It appeared desirable, therefore, that their services should be utilized in carrying such matters to a conclusion.

They had to do, primarily, with the prosecution of rent claims against tenants of the debtor's premises who had defaulted in the payment of rent, together with tax refund claims against both the City and the State of New York.

A number of such claims necessitated tedious and prolonged litigation, both in original suits, and in supplementary proceedings.

The net result of those activities on the part of these petitioners was that they recovered on rent claims the sum of $124,944.58 and $9,575.02, on tax claims, a total of $134,519.60.

The time expenditure in doing this work was 3,105 hours. The compensation requested is $40,000 together with their reimbursement of expenses in the sum of $462.80. During the course of the proceedings, and upon account of services rendered in their capacity as associate counsel to the trustees, these claimants received interim allowances of $28,500.

The Commission objects to disbursements of $23.75 which were incurred for local car fares and telephone calls. With this deduction, it approves of applicants' disbursements in the sum of $439.05. To that extent, the disbursements are allowed.

So far as petitioners' compensation is concerned, the Commission believes that it should not exceed $30,000. Its recommendation, in part, is based on the fact that practically all the work was done by members of the firm of McNamara & Seymour when, in the ordinary course of events, much of it might have been performed by subordinates. This probably is true. Furthermore, some of the work for which compensation is asked may also be included in what was done by these petitioners in the certiorari proceedings. I think, therefore, that I shall adopt the recommendation of the Commission, and fix the sum that McNamara & Seymour shall be allowed at $30,000 for services and $439.05 for disbursements, of which $28,500 has been paid for services and $439 for disbursements.

### Application of Olin, Murphy & Redmond, Attorneys for Empire Trust Company, Indenture Trustee.

█ This firm of attorneys asks that it be compensated in the sum of $31,000. The Securities and Exchange Commission recommends that the petitioners be paid $17,500, together with $1,440.02 in repayment of their disbursements. This latter allowance has heretofore been authorized, and I have likewise directed that petitioners be paid $15,000 on account of their application for fees. I proceed to a determination of the amount they shall finally receive.

In summarizing the services of these petitioners I cannot do better than to set forth a portion of the remarks made by Mr. Finnigan, representing the Securities and Exchange Commission, upon the hearings having to do with the several petitions for allowances that are presently before me. I quote:

"Olin, Murphy & Redmond were retained as counsel by the Empire Trust Company at the beginning of the proceeding because of the conflicting interest of McNamara & Seymour, who were counsel for the debtor, and had previously represented the Empire Trust Company. Because it was then a new client they were called upon to do a great deal of work which Messrs. McNamara & Seymour would not have to do because of their familiarity with the proceeding. They had to go through and read the original indenture, the subsequent amendments, of which there were two, and the third mortgage which was issued in connection with the debentures for their additional security.

"I think I may say that this firm * * * has taken a more active interest than one is accustomed to find taken by counsel for

indenture trustees. Usually, they try to remain so neutral that you do not know they are in the proceeding until the time comes for allowances, but that is not true of Mr. Redmond. There were two aspects of the matter which required a great deal of study on his part, and which required determination by the Court. One was this question of the possible differentiation * * * of the debentures. There were two kinds of debentures, legended and unlegended. The legended debentures arose out of a proposal by the debtor to change the terms of the indenture pursuant to agreement so that instead of waiting until they were drawn by lot the debentures could create a market by being sold to the debtor * * * by means of the annual or semi-annual lottery, and it had very involved procedures whereby the Empire Trust Company, as depositary, kept the legended debentures that were bought in the market and were turned over to the debtor. The result was, in effect, to make the debenture sinking fund under the indenture to stretch out further than it would have (done) under the terms of the indenture itself.

"Now, the very agreement, pursuant to which these debentures were legended, says that they should be held for the benefit and priority of the legended debenture holders, and there were almost $600,000. worth of legended debentures, and on the face of it it appeared that if they were to be held, as it was stated, for the benefit of the legended debentures, they would have to receive an allocation under the plan instead of being cancelled.

"As the plan provided that the legended debenture holders would receive more than the unlegended debenture holders, it had to be explained. I mean there had to be testimony in the record. The late Mr. McNamara testified at some length to the reasons for the original agreement and so forth, but on the face of it it was something that had to be decided and it took time, and it took a great deal of ingenuity, I think, on Mr. Redmond's part to work out the arrangement whereby it was finally decided that there were not two classes of debentures.

"He did one other thing that unfortunately resulted unsuccessfully, and that was for the proposal for the payment of interest on interest in which he was vociferously joined of course by counsel for the debenture holders' committee, and, as your Honor recalls, they had to go to the Circuit Court to find out that your Honor was right in the first place, and that they were not entitled to it. However, it was something that had to be decided. There were differences in this situation and the situation under which the Supreme Court and the Circuit Court had acted in other cases. We, for one, were sure of our ground and so was Mr. Duncan, and so I think was the Court, but still one cannot say it was not a triable issue, and the fact that the Circuit Court spent so much time in considering the argument appeared to everybody to be an assurance that they really had had something when they first went up there. I think that it was Mr. Redmond's duty, the indenture trustee's duty, to advance this argument, and that, as trustee for all the debentures, he had to go through with it, and he had to take the appeal.

"In addition to that, because of his familiarity with indentures, mortgages and things of that kind, I think he was invaluable to the trustee's counsel in the preparation of various papers. I know that he spent a great deal of time with Major Hooker in going through the participation A's and the participation B's and the various maneuvers in connection with the Equitable mortgage in the first place, and also with those legended debentures and other things that were necessary for the Major to include in the 167 report,

"The time spent by members of this firm total 1380 hours, and since Mr. Redmond spent 1310 of them, and it is hard to find that there was any evidence of duplication there, however, the Commission feels that the amount requested of $31,000, while it might be permissible outside of reorganization, is much too much in a reorganization proceeding, and that the maximum reasonable fee should not exceed $17,500."

Much as I respect the Commission's point of view, I am of opinion, after observing Mr. Redmond's work for a period of about

seven years, and having in mind the responsibility that rested upon him in looking after interests that represented a value of more than $6,000,000, that the fee of his firm should not be less than $25,000. It will be fixed at that amount.

### Application of McDermott, Turner & Hart, as Attorneys for Empire Trust Company, Depositary for the Debtor's legended debentures.

■ Due to a possible conflict of interest between the rights of the holders of the debtor's legended debentures and those which were not so marked, during the course of this administration, it became necessary for Empire Trust Company, as depositary of the legended debentures to be advised with respect to this subject matter. For that purpose, the trust company retained this firm of attorneys. In doing the work assigned them, McDermott, Turner & Hart spent a total of 50¾ hours. In examining and considering the contents of papers served upon them in connection with other features of the administration, they spent an additional twenty-five hours. For the total of the services performed, petitioners ask that they be compensated in the sum of $2,000.

With respect to this application, Mr. Finnigan said, inter alia:

"Altogether they (petitioners) spent 75 hours, of which 25 were various routines, in considering papers which had nothing to do with the indenture trustee at all. Five or six, indeed, were spent in the preparation of this application for an allowance.

"On the basis of the beneficial services performed, the Commission feels that even the $2,000 figure applied for is most excessive, and that a reasonable fee should not exceed $600."

My appraisal of the value of the work performed by these petitioners is $750, and their fee will be fixed at that sum.

### Application of Gerdes & Montgomery, Esqs., Attorneys for Wertheim & Company, Benjamin J. Friedman, Allen C. Dubois, as trustee under the Last Will of Maria C. Dubois, and Raymond H. White, owners and holders of $498,000, principal amount of the debtor's 5% Sinking Fund Debentures.

■ These petitioners entered these proceedings on or about April 27, 1943, some two years after the date on which the trusteeship was inaugurated. At that time, the trustees were engaged in the formulation of a proposed plan of reorganization. In connection with this procedure, petitioners had conferences with the trustee concerning the problems involved. They also engaged in conversations with the chairmen and counsel of the several committees of debenture bondholders with respect to the means and methods whereby a plan could be effected. In so doing, they were required to give attention to all proposals and suggestions then under consideration.

From time to time, petitioners voiced opposition to some of the suggestions of the trustees, and on March 15, 1945, they filed a substitute plan of reorganization. Subsequently, and following various conversations, the trustee filed an amended plan which embodied numerous features that had been suggested by this firm of attorneys.

When, in the course of the hearings on the proposal of the Trustee, the Court stated that, in its opinion, the stockholders were entitled to participate in the reorganization of the debtor, these petitioners, after conference with debenture bondholders, the Commission, and the stockholders, adopted the suggestion of the Court, and proposed amendments to the plan which would effectuate the Court's point of view.

Following confirmation of the Trustee's amended plan of reorganization, Messrs. Gerdes & Montgomery actively participated in drafting the certificate of incorporation of the new company which was to serve as the vehicle of reorganization. They also took the lead in the preparation of the new company's by-laws, and in drafting the trust indenture that was to secure the new issue of bonds provided by the plan.

Following the completion of these details, the directors of the new corporation retained petitioners to perform the legal services that were essential to the consum-

mation of the approved plan. They prepared the necessary minutes and resolutions, and attended meetings of the new board. They also arranged for the listing of the securities of the new company on the New York Stock Exchange. They then took such steps as were necessary for the transfer of the debtor's assets to the new company. These services, as may easily be appreciated, required the expenditure of time, effort and ability. When all this had been done, and the 1946 plan was about to be consummated, the situation was completely changed by the proposal made upon behalf of the stockholders by the City Investing Company.

In the litigation that followed, petitioners were leading actors in all that took place in the District Court, the Appellate tribunal of the Second Circuit and the Supreme Court of the United States.

When the plan of 1946 was, in effect, set aside, petitioners urged their client, Wertheim & Company, to consider the advisability of offering, on its own behalf, to underwrite a plan for the payment of the debentures in full with interest, in accordance with the opinion of the Circuit Court, and in this they were entirely successful.

In performing the work set forth in the petition now before me, Messrs. Gerdes & Montgomery state that the total time expended by their firm was not less than 1,900 hours. With the exception of 322 hours of work done by subordinates, the remainder occupied the time of Messrs. Gerdes and Montgomery, the Senior partners. The total compensation requested is $45,000. This sum is calculated on the basis of approximately $26 per hour for Senior's time and $13 per hour for that of Juniors. Petitioners ask also that they be reimbursed for expenses in the sum of $1,412.66.

When the application of Gerdes & Montgomery was called for hearing in open court, Mr. Finnigan questioned their right to receive either compensation or reimbursement for expenses. He said:

"Gerdes & Montgomery has appeared * * * as counsel for * * * Wertheim & Company, and really for what we might call the Wertheim group in that they represented not only Wertheim & Company, but several of its customers.

"Your Honor will recall that Mr. Montgomery and Mr. Gerdes later took part in the proceedings involving this (present) plan of reorganization, and, as Mr. Montgomery points out in their application, he always took the position that he would rather give the stockholders an equity than have litigation.

"There is no question that beneficial services were performed by this firm in connection with the plan that was almost consummated on July 8, 1946. There is some question as to whether the services subsequently performed in resisting the attempt to open the proceedings so that the plan finally adopted might be submitted were compensable, because they were completely unsuccessful. Of course, it was in a sense a novel question of law. However, there is a very serious consideration which in the viewpoint of the Commission makes it obligatory for this firm to go to their clients for their fee.

"The Wertheim group was not in the same position as the other debenture holders; what they were looking for was something different: They were looking for control of the building. That has been the subject of so much vituperation in the last two years that I hate to bring it up, but there is no question that when Wertheim bought all these bonds during the proceeding, and when their clients were advised by them—because Mr. Hilson said they were—to buy these bonds, they were doing it for a purpose different from the ordinary public investor who had bought a few bonds. * * *

"I think that it may be safely said that the Wertheim group dominated the board of directors as approved by this Court, and as a matter of fact, Messrs. Gerdes & Montgomery were retained as counsel by that company.

"I neglected, in discussing the legal principles which the Commission had in mind in making its recommendations, to make one further observation. The courts have held, and we believe it sound, that a person who represents a selfish—I mean 'selfish' in the good faith sense—interest is not entitled to be compensated for services which were collaterally of benefit, or incidentally of benefit to the whole estate.

"Now, * * * in the beginning of the proceedings, Gerdes & Montgomery rendered services which unquestionably were beneficial. They were beneficial, however, from the viewpoint of Wertheim & Company, their client, although incidentally, and collaterally, they benefited the whole estate. I do not think there is any question for that reason, because of Wertheim's unquestionable selfish motive.

"The things that guided them were loaded with potentialities so conflicting— as a matter of fact, they did not happen; there never were, as far as we have been able to find out, any conflicts that resulted in any damage to the debenture holders, but under the law, as we see it, the fact that the potentialities existed is enough to condemn the relationship in so far as compensation from the Court is concerned, because the insider moves, the man with control, the man with 40 per cent of the debentures, moves obviously where his own interest lies, and in this case it was the control where people may act to the detriment of the debenture holders. I grant you I have not said that they did, but because of the potentialities, * * *, there should be no compensation paid out of the estate to Gerdes & Montgomery.

"* * * Wertheim & Company bought these bonds during the proceeding, these debentures, and there was no reason why they should not. They were not in a representative capacity, and when they acted with their clients, they did not come in here as a debtor, * * * they were blunt about who they were * * * because they felt free to pick up the debentures, they also have the same regard for the stock, and there is no reason why they should not have from their point of view.

"One time they took over 7,000 shares of stock in their own name, although it belonged mostly to customers, which they had sold when it appeared there was not going to be an equity, and they and their clients had about 33,000 more to be in a position where they could come in with an underwriting, if necessary, as stockholders, since the debenture holders would not be affected by a plan which paid them off. There was nothing wrong in what

they did, but I mention that to the Court because there were potentialities which could have been wrong, and the fact that the potentialities existed, in the eyes of the Commission, is enough to condemn them from receiving an allowance out of the estate.

"Whatever fee they may receive from Wertheim & Company I think has been well and substantially earned but * * * they should not receive a fee out of this estate. * * * The same thing applies to disbursements. * * * They may look to their clients for the payment of them.

"I suppose I should mention it, and that is as to several hours spent in the time included in this application which are in connection with conferences * * * on the new underwriting. However, counsel makes this differentiation that they did not represent Wertheim & Company as an underwriter, and, of course, if they did, there would be no question.

"Hodges, Reavis, Pantaleoni & Downey did represent Wertheim as an underwriter, and have not come in and asked for a fee. If Gerdes & Montgomery had represented them throughout, there is no question that they could not come in and ask for a fee either. * * * It does not make any difference, because all the time it was the same Wertheim, whether he was buying debentures for the control of the building, or appearing as an underwriter for control in another way. It is still Wertheim & Company, and he should still pay his lawyers himself."

The record before me indicates that the present petitioner represented not only Wertheim & Company who held $436,000 principal amount of debentures, but also Benjamin J. Friedman, owner and holder of $50,000 par value of these securities, Allen C. DuBois who held $2,000, and Raymond H. White who held debentures to the extent of $10,000 par value. Subsequently Wertheim & Company increased their holdings.

So far as Wertheim's alleged domination of the reorganized company is concerned, it should be stated that the Court, after giving consideration to the suggestions of all parties in interest, appointed the di-

rectors who during the early stages of the new company, were to control its destinies. That board was as follows:

Howard S. Cullman, a nominee of the Granger Committee,

Harry R. Amott, Chairman of the Amott Committee,

J. Donald Duncan, a Trustee of the Debtor,

Edwin I. Hilson, a partner of Wertheim & Company,

Charles A. Dana, Nominee of the Stockholders' Committee,

Jeffrey S. Granger, Chairman of the Granger Committee,

John S. Traphagen, who represented debenture bondholders to the extent of debentures having a par value of $422,000.

The officers of the new corporation were:

Howard S. Cullman, Chairman of the Board,

J. Donald Duncan, President,

H. E. Miller, additional Trustee of the Debtor, Treasurer,

James C. Lott, Secretary.

It will thus be seen that Wertheim & Company, out of the seven members of the Board of Directors, had but one representative, viz., Edwin I. Hilson. None of the company's officers could have been said to be under the control of Wertheim & Company.

During the conferences, discussions and court hearings that culminated in the 1946 plan of reorganization, petitioners consistently took the position that if it were possible for recognition to be given to stockholders, such course should be pursued. It also appears that, in 1947, after the 1946 plan was upset by the appellate court, and when the City Investing Company had retired from the scene, petitioners played a part in persuading Wertheim & Company to offer itself as an underwriter of the existing plan of reorganization. So far as I can discern, the conduct of Wertheim & Company in the proceedings that ensued is not open to the slightest criticism. That company did not dispose of their debentures until, under the new plan, they were to be paid off at par and interest.

This sale is said to have been made solely for income tax purposes.

Indeed, as Mr. Finnigan freely admits, there is nothing whatever to indicate that Wertheim & Company overreached or sought to overreach, any interest in this proceeding. The potentialities of wrong doing, on which the Commission asks that an allowance be denied to Gerdes & Montgomery, were common to each and every interest in this proceeding including the Court itself. In the absence of any evidence or indication, that Wertheim & Company were guilty of bad faith or corruption, and in the light of the admission of the Commission that the services of Gerdes & Montgomery were of benefit to this estate, it would, in my opinion be both ungenerous and unjust to deny them a right to compensation.

Furthermore, when the 1946 plan came under attack, it is difficult to see why Gerdes & Montgomery should not resist the assault. That plan had been accepted by the requisite majority of both creditors and stockholders. After a full opportunity to stockholders to come forward with a better and more favorable plan, the court sanctioned the proposals of the Trustees and in this the Commission acquiesced. The time to appeal from my order of confirmation had expired, and, as a result, new equities had been created, and these involved novel questions of law. Committees of debenture holders whose rights were affected, along with Gerdes & Montgomery, also resisted the attacks upon the 1946 plan. With approval of the Commission, these interests have asked for, and are receiving compensation. Under these circumstances, it is, as I have previously indicated, entirely unfair not to recognize the earnest endeavors of these petitioners. See In re Philadelphia & Western Ry. Co., D.C., 73 F.Supp. 169.

After careful consideration of the application of these petitioners, I am convinced that they are entitled to compensation. For work done, they ask that the labors of partners be rewarded at the rate of approximately $26 per hour, and that of Juniors at $13 per hour. These requests are far out of line with fees that I have

been accustomed to award. If they were to be granted, it would mean that, on the basis of a seven-hour day, partners would be paid at the rate of about $182 per day, and Juniors at $91 per day. Compensation, on this scale, is far more than this reorganization can stand.

For these reasons, I have concluded that the fee to be awarded to Gerdes & Montgomery should not exceed $25,000. In addition they will be repaid their disbursements of $1,412.66.

### Application of Hardy, Stancliffe & Hardy.

Messrs. Hardy, Stancliffe & Hardy who here ask for a fee of $7,500, together with disbursements of $575.05, and who represented certain debenture bondholders, did not participate in these proceedings until July 11, 1946. At that time the decree of this court which had approved the Trustee's plan of reorganization, as amended, was under attack. It was then apparent that the attack, should it become successful, would seriously impair the position then held by petitioner's clients. In order to avert this possibility, petitioners entered the proceedings and participated in the litigation that followed. That their work was competent, and worthy of compensation from some source, I have no doubt.

But, as matters turned out, I do not see that petitioner's efforts were of any benefit to the development of the plan of reorganization that has now been consummated. The most that can be said is that petitioner's work was little, if anything more, than a duplication of the efforts put forth by the attorneys for other debenture holders who had represented them from the inception of the proceeding. These last mentioned attorneys were entirely competent to protect the interests of the debenture holders, and valiantly sought to do so. Inasmuch as petitioner's clients wished to be represented by counsel of their own selection, they should, in my opinion, defray the expense of their course of action. It follows that the application of Hardy, Stancliffe & Hardy must be denied.

### Application of Emanuel Redfield.

This petitioner is in much the same situation as Hardy, Stancliffe & Hardy whose petition for an allowance as set forth above, has been denied.

Mr. Redfield first appeared in this proceeding on August 16, 1946. His clients were Isidor Frank and Arthur W. Lichtenstein, each of whom was the holder of the debenture bonds of the debtor.

Upon their behalf, and in their interest, Mr. Redfield endeavored to sustain the order of this court, which, had it been executed, would have carried out the Trustee's reorganization plan. Petitioner acquainted himself with the facts of the case, consulted with parties in interest, prepared briefs, and argued his contentions before Mr. Justice Reed at New City, New York. His work was merely a duplication of that done by attorneys representing the long standing committee of debenture bondholders, and contributed nothing to the present plan of reorganization. In February, 1947, Mr. Redfield's clients sold their debentures and passed out of the reorganization picture. Thereafter, Mr. Redfield's interest in the proceedings was nothing more than academic. He should look to his clients, and not to the estate, for services previously performed.

The application is denied.

### Application of Harry R. Amott, Jesse L. Shepherd, Francis E. Smith, Hubert F. Young and Florence Abbott Buckingham, as Executrix of the Estate of Lee S. Buckingham, Deceased, Who with the Exception of the Executrix, Constituted a Debenture Holders Protective Committee, That Took an Active Part in These Proceedings.

These applicants request that they be compensated in the aggregate amount of $29,140 and that they be reimbursed for their expenses in the sum of $1,957.99. The petition discloses that the members of the Committee devoted a total of 1914 hours in carrying on their work, such time being made up as follows:

Mr. Amott ................... 1000 hours
Mr. Buckingham ............ 100 hours
Mr. Shepherd .............. 450 hours
Mr. Smith .................. 114 hours
Mr. Young ................ 250 hours
 ───────
 1914 hours

In this connection, it is suggested that Mr. Amott, Chairman of the Committee be paid at the rate of $20 per hour, and that the other Committeemen be paid at the rate of $10 per hour.

The Securities and Exchange Commission is of opinion that the fees of the Committee as a whole should be limited to $12,500, plus reimbursement for expenses.

Concerning the work of the Committee, Mr. Finnigan had this to say:

"* * * In the beginning of the proceeding they represented a great many debenture holders (559 separate holders of $1,883,500 of the bonds) and I assume that many of their clients were still debenture holders at the conclusion of the proceeding. It was necessary, therefore, for them to engage in a lot of services in connection with advising the debenture holders, and sending out to them letters.

"They sent out a number of letters and * * * diligently asserted the rights of the debenture holders whenever it was necessary or advisable to do so.

"Some claim is made in the application for (securing) that mortgage * * * of $14,750,000, and color is given to that claim of credit for that mortgage by the tentative commitment which was received and offered by Mr. Bernstein in evidence in August of 1947. That was a $15,000,000 mortgage, which was in a number of respects similar and in some respects dissimilar, to the $14,750,000 one eventually accepted by the Court.

"I do not know whether this is the proper time to go fully into the question of that mortgage. I do not think it is, but I would like to point out that in February or March of 1947, Mr. Duncan had engaged in correspondence with the John Hancock Insurance Company, and copies of that correspondence are in the record.

"Furthermore, there is no question, I believe, that it was Mr. Duncan who went up and saw the directors or trustees and hammered the nails home, as it were, and obtained the final terms which resulted in the very favorable mortgage that the company is now laboring under.

"The Committee made a contribution, I think in connection with the first plan. The question arose as to the participation by the debenture holders in new stock, or in funded debt, and some of the debenture holders' representatives were insisting upon your Honor, chiefly for tax reasons, in having at least 80% of the debenture participation in the new plan expressed in terms of income bonds.

"This committee through its counsel offered the suggestion that a 50 per cent participation in debentures and a 50 per cent participation in stock would make the plan more feasible, and would be as readily acceptable. Of course, the eventual one was 60 and 40, and the trustee's assertion that 80 per cent was entirely out of the question was supported by the recommendations of this committee and its counsel, so I think a definite contribution was made in the conferences which resulted in that formulation of that plan by the attitude taken through this committee by its counsel.

"The committee held only five formal meetings, and while Mr. Amott was at a great many of the hearings, other members of the committee, because of their situation, did not feel it necessary to come, and I agree that there is no reason why the four of them should have appeared."

There is no doubt that Mr. Amott and his fellow committeemen were able and responsible men, and I am prepared to say that they were helpful in this proceeding. Nevertheless, I feel, all things considered, that the compensation here asked is excessive, and I shall fix the fees of the committee as a whole, at $15,000. It may be apportioned among petitioners as they see fit. Disbursements of $1,957.99 will also be allowed.

Mr. Miller, the secretary of the Committee, will be allowed the sum of $500 for his services in that capacity.

Application of Scribner & Miller, Attorneys for the Amott Committee of Bondholders.

This firm of attorneys has filed a petition of 101 typewritten pages of legal cap paper, in which, in great detail, are set forth the activities in which the members of the firm participated. The petition concludes with this statement:

"Your petitioners accordingly respectfully pray that they may be awarded compensation for services rendered to this estate in the amount of $83,200, which has been computed as follows:

Partners 2605 hours at $30 per hour ....................... $78,150
Seniors 147 hours at $20 per hour 2,940
Juniors 217 hours at $10 per hour 2,170
 ———
 $83,260"

Since the above petition was drawn, Scribner & Miller have devoted 103 additional hours to this proceeding.

With respect to this application, Mr. Finnigan, speaking on behalf of the Securities and Exchange Commission, said:

"Again I must advert to the Commission's criticism in the way in which attorneys keep their records. It was impossible for me * * * to determine what part of the time spent was in the opinion of the Commission compensable, and what time was just wasted effort or non-compensable, because non-successful. I found some difficulty in various assertions of time spent. For example, at one time, Mr. Bernstein talked about four things that he discussed at length, and when I got to his (time) sheet, he had only spent an hour. And at another time, he had reviewed at length six different topics and it only took an hour and a half. I don't know personally what he meant by 'at length', but that sort of thing just makes it impossible for the Commission to really allot the time that the attorney asserts in his application, or even to point out * * * how much of it is not compensable.

"The Commission feels that Mr. Bernstein, that is, that Scribner & Miller, has done a good job in this proceeding. I do not know that I have anything to add

that I have not included in my statement about their services to the Amott Committee.

"Mr. Bernstein from the very beginning of the proceeding acted as a sort of a gadfly. He felt that he wanted to get things moving, and that the best way to get things moving was to go around and talk to people about what they could do. Well, I appreciate the inspiration that made him do it, but I do not think that there is any question that a lot of it was wasted time, especially in the beginning of the proceeding when nobody really knew what the reorganization was yet all about, and it is just impossible to include a lot of the time there spent as compensable time.

"However, I think that the Commission's recommendation of $30,000 is a reasonable, and perhaps generous one, for the services performed.

\* \* \* \* \* \*

"I mentioned in the beginning that Mr. Bernstein is not yet satisfied that the old management, the Du Pont management and Mr. Horowitz, should not be liable to the debtor for causes of action, and he has included in his time some of the time, not all of it, that he has spent in investigating into this particular problem.

"I do not think that the time so far spent is compensable. I think that if there are final results beneficial to the debtor as a result of this that then all the time he has spent on that will be compensable, but until that occasion arises, I do not think that the Court should consider it."

That Scribner & Miller, acting principally through Mr. Bernstein, were sincerely interested in this proceeding, and that they devoted their best efforts to be helpful to the Court, and to the interests on behalf of which they appeared, is beyond question.

The fact is, nevertheless, that the effort expended in making inquiry into transactions between the Du Ponts and the Equitable Life Assurance Society of the United States some twenty or thirty years ago has not yet borne fruit. Unless and until this comes about, I fail to see how I can properly compensate these petitioners at the rates above specified for that investigation, particularly when petitioners' clients have

no further interest in the affairs of the re-organized corporation.

There is another matter, and it relates to the certiorari proceedings having to do with the taxation of the debtor's real estate by the municipal authorities of the City of New York. This situation, at all times, was under the active supervision and control of the Trustees. The attorneys for the debtor were likewise busily engaged in seeking a refund of excess taxes collected by the City, and in bringing about a reduction in the tax assessments of the property at 120 Broadway. Indeed, special counsel was employed to try the certiorari cases in the Supreme Court of the State. The competence of these attorneys must be admitted. It seems to me, therefore, that there was no necessity for Scribner & Miller to supervise their work. Nevertheless, they spent a great deal of time in doing so.

One other item of services for which compensation is asked is worthy of mention and that is the petitioners' effort to effect a sale of the debtor's real estate. This, of course, did not take place, and I fail to comprehend the theory on which petitioners' effort in this behalf can be entitled to compensation at the expense of the reorganized company.

After a perusal of petitioners' application for allowance and having in mind the marked ability and earnestness of Mr. Bernstein in the reprensentation of his clients, I feel myself unable to award Scribner & Miller compensation in a greater sum than $30,000.

### Application of Douglas Vought, a Real Estate Expert Who Was Retained by the Amott Committee.

 Mr. Vought is well and favorably known in the local real estate field and, during these proceedings he gave testimony with respect to his opinion of the value of the debtor's property at 120 Broadway. He also advised against the Trustee's acceptance of the City's offer of compromise in relation to the excessive municipal taxation of that real estate.

Beyond this, he gave aid and assistance in various ways to the Committee that retained him. He now requests that he be compensated in the sum of $3,500.

In connection with the work involved, Mr. Finnigan said:

"An examination of his application indicates that all of this time was not spent * * * with this appraisal, as was the case with Mr. MacRossie, where all of his time was involved merely in that appraisal, and that is true also of Mr. Altreuter, but Mr. Vought came in at the beginning * * * and * * * rendered services and spent time for the benefit of the committee itself and for the benefit of Scribner & Miller, which I do not think should be included in his compensable time.

"I think it also obligatory to point out that the appraisal report submitted by Mr. Vought was by comparison with the others rather superficial. He did not include the specific breakdowns that were included in the other appraisals. However, I do not say that in derogation of his services. I think that the services were beneficial and that he is entitled to be paid.

"However, the Commission feels that $1,500 would be a reasonable fee."

Mr. Vought has heretofore been paid the sum suggested by the Commission, but I am of the belief that, all things considered, he should have an additional sum of $500. It will be so ordered.

### Application of Jeffrey S. Granger, Harry Thompson and C. G. Gifford, Constituting a Committee Representing Holders of the Debtor's Debentures in the Amount of $811,000 and Paul Bauman, Secretary of the Committee.

 This committee asks that it be paid $25,000 by way of fees, and be allowed $576.08 as reimbursement for expenses incurred. Mr. Bauman, Secretary of the group, requests a fee of $4,000. The Securities and Exchange Commission has informed the Court that, in its judgment, the compensation of the Committee should be limited to $7,500, and that its reimbursement for expenses should not exceed $226.08. It also suggested that Mr. Bauman's fee be fixed at $350.

The record shows, and the Commission concedes, that this Committee took an active interest in the reorganization proceedings, and that its services were helpful in the negotiations that were had with stockhold-

ers in connection with the plan of reorganization that was approved in July of 1946. Throughout the seven years since the formation of the Committee, Mr. Granger devoted 352 hours in consideration of the problems that were involved. Mr. Thompson contributed 300 and Mr. Gifford 290, a total of 942. Mr. Bauman, in the performance of his work, spent 175 hours.

Upon consideration of the record now before me, with respect to the work done by this Committee and its Secretary, I have concluded to allow $10,000 to the Committee and $750 to Mr. Bauman. The Committee will be reimbursed for its expenses to the extent of $226.08. The reason for this limitation is that, in my judgment, a voluntary Committee in a reorganization proceeding should not incur expense in the employment of expert help without first obtaining the approval of the Court.

Application of Wagner, Quillinan, Wagner & Tennant, and Tachna & Pinkussohn, Attorneys for the Granger Committee of Debenture Holders.

These attorneys, from the inception of the reorganization proceedings, took a prominent part in the administration. Furthermore, their work was intelligently planned, and ably executed. These conclusions are supported by Mr. Finnigan, representing the Securities and Exchange Commission, who said:

" * * * this Committee was diligent in protecting the interest of the debenture holders, and we believe that their presence in the case was of benefit to the estate.

"Mr. Nussenfeld spent a great deal of time on paper work toward the end of the 1946 plan. He spent a great deal of it in Major Hooker's office assisting in the preparation of the new indenture and the other documents necessary for confirmation and consummation, and while that is not necessarily compensable work because he was after all, a volunteer, nevertheless, because he represenetd an interest of creditors, I do not believe that we can say that the time should not be compensated for at all.

"In the opinion of the Commission, the $50,000 requested is excessive, and that a maximum fee of $20,000 would be reasonable and adequate. That is, for both firms

* * *. The amount of $138.07 (disbursements) does not appear to the Commission to be objectionable in any way."

In the petition now before me, the following statement is made: "Within the foregoing limitations, and making the best estimates possible for the time spent by Judge Rifkind and Mr. Pinkussohn, and making what we consider to be reasonable allowance for unrecorded time spent by others, it is our best judgment that petitioners devoted to this proceeding in excess of 1,750 hours (or 250 days of seven hours each)."

As respects the consumption of time, Mr. Finnigan took occasion to say: "In Mr. Nussenfeld's application, I did detect a duplication of 104 hours which Mr. Nussenfeld and Mr. Quillinan spent together. That is, he spent 52 hours in conferences between them, which the Commission feels is compensable work, but, of course, we don't compensate two people for talking to each other at the same rate as you would compensate them for original work."

Taking the petition in its entirety, and bearing in mind the extent to which the debenture holders were represented in this administration, I am decisively convinced that the view of the Commission as to the fees to be awarded to these petitioners is fair and equitable. Their allowance will be fixed at $20,000, plus disbursements.

Application of the 120 Broadway Debenture Holders' Committee.

This Committee was formed on or about June 15, 1941, to represent, as its name indicates, debenture bondholders of Equitable Office Building Corporation. In response to a letter of solicitation to the owners of such securities, it received authorization to speak for the holders of such bonds in the aggregate amount of $191,000. The Committee itself, while it retained counsel who appeared throughout the proceedings, was not particularly active. Indeed, aside from the original letter of solicitation, it seems to have done little or nothing. Its work, indeed, was limited to 35 hours.

For this service, the Committee asks that it be allowed $1,250. It also requests that it be granted $110 for estimated expenses.

552

The latter sum is more or less uncertain inasmuch as the Committee's records and vouchers, due to war exigencies, have been lost or mislaid.

The Securities and Exchange Commission suggests that the Committee be allowed for services rendered herein a sum not to exceed $250, and that its claim for its estimated expenses be rejected.

It seems to me that although the Commission's suggestion as to fees is well within reason, $350 would be more fitting. While, ordinarily, I would make no allowance for estimated expenses, I think, under the circumstances, I am justified in doing so here. The petition sets forth the printed matter that the Committee sent to stockholders and I am satisfied that the cost of the preparation of that material, and the postage easily cost the sum of $110. The item is allowed.

Application of Brower, Brill, Ennis & Gangel, Attorneys for the 120 Broadway Debenture Holders' Committee.

 For services rendered in the course of the reorganization proceedings, the above mentioned firm asks that it be paid the sum of $20,000. The Securities and Exchange Commission suggests that the allowance be limited to $1500. Mr. Finnigan, on behalf of the Commission, at the time of the hearings on the applications for allowances, said: "I might point out that because of the changes in personnel * * * counsel have been unable to supply us with any accurate statement of hours spent. We do not know that Mr. Hoffman, representing that firm, attended a number of conferences at the trustee's office, and that he attended, I think, all the hearings on the plan here, but, as I said, the Commission is unable to find that the estate particularly benefited by reason of their presence in the case except to point out that they did support the plan that was confirmed in 1946."

The petition now before me contains this statement: "We held numerous conferences among ourselves out of Court as co-attorneys, but here again have figured the time consumed * * * as that of one attorney. We estimate, accordingly, that we devoted in excess of 750 hours for all of us as to the matters herein during the last sev-

en years. We believe that we rendered substantial and constructive services herein."

Attached to the petition is a schedule of the activities of the members of the staff of this firm of attorneys.

A careful perusal of this schedule indicates that, in this proceeding, petitioners' participation was of a passive rather than an active nature.

Members of the firm attended numerous conferences with the trustee and other parties in interest; they also engaged themselves in keeping in touch with the progress of the administration, and were faithful in their attendance at hearings before the Court. They also attended, and were heard at the hearing had before Mr. Justice Reed, on September 24, 1946.

Representing debenture bondholders, petitioner gave support to the trustees' plan of reorganization which has been superseded by the one now in effect.

So far as appears, these applicants had no occasion to draw any petitions or orders that were of an intricate or involved character, or any that required special skill or initiative. For the most part, they simply acquiesced in what was done by other attorneys representing interests similar to their own.

Under these circumstances, I simply can not countenance a fee of $20,000. Indeed, if petitioner be allowed $3,750, I think their compensation will be adequate, and possibly generous. Therefore, it will be fixed at that amount.

Application of Charles A. Dana, Sir James Dunn and Newcombe C. Baker, as a Common Stockholders Committee of Equitable Office Building Corporation, and of Gabriel E. Torre, Former Secretary and William D. McCain, Present Secretary of the Committee, and for the Committee's Reimbursement of Costs and Expenses Incurred by its Membership.

 This Committee came into existence in April 1941. As originally constituted, its members were Charles A. Dana, who owned, directly or indirectly, some 30,000 shares of the common stock of the

debtor; Sir James Dunn, who together with his wife, held about 106,235 shares, and John W. Hubbard, the owner of 11,500 shares. Each of these persons had been a director of the debtor and was, therefore, more or less familiar with its problems and difficulties.

In May of 1941 Newcombe C. Baker and Donald Percy were elected as additional members of the Committee. Mr. Baker was likewise a director of the debtor and also a member of the firm of Laird, Bissell & Meeds, investment bankers, who, in 1925, had underwritten a sale of the debtor's stock.

Mr. Percy was connected with the real estate firm of Brown, Wheelock, Harris, Stevens, Inc. He resigned in October, 1941, and was succeeded by Morgan D. Wheelock, of the same firm. The latter served from April 27, 1942 to August 12, 1942 when he entered the armed services of the United States.

In June of 1947, Mr. Hubbard died.

When the committee was first organized, Gabriel E. Torre was designated to act as its Secretary. He continued to do so until October 23, 1942, at which time he went into war service. William D. McCain thereafter served the committee in the capacity of Secretary from January, 1943, until the consummation of the present plan of reorganization. He was also an associate of counsel for the Committee. Messrs. Torre and McCain are members of the bar.

Although the Committee never actively solicited powers of attorneys from stockholders, persons owning an aggregate of 34,262 shares voluntarily gave such powers to the Committee. In addition, the Committee had occasion to communicate with many other stockholders scattered through twenty American States, and Bermuda, Canada and England.

As can readily be imagined, this Committee kept in close touch with all phases of the administration of the debtor, and the scope of its activities is summarized in my comments with respect to the application of its attorneys, Wickes, Riddell, Bloomer, Jacobi & McGuire.

For services rendered, the Committee asks that it be compensated in the sum of $50,000, and also requests that Mr. Torre be paid $750, and Mr. McCain $1,500. Furthermore, I am petitioned to authorize the payment of $2,760 to Laird, Bissell & Meeds, of which firm Mr. Baker is a member, and to reimburse that organization for expenses incurred in making analyses and studies of the various proposals that were made with respect to reorganization plans.

The present petition states that Messrs. Dunn, Percy and Wheelock seek no allowances for the contributions that they severally made to the services rendered by the Committee.

Concerning the work of the Committee and its membership, Mr. Finnigan said:

"I think that it may be said that the work done by this committee was of benefit, * * * particularly in connection with the 1946 plan, because they, through their counsel succeeded in obtaining an equity for the stock that the trustee and the S. E. C. did not believe existed, and I think that was skillful and * * * beneficial service. However, there are some difficulties about the request (of $50,000.) for compensation.

"Sir James Dunn * * * has not requested a fee. * * *

"Mr. James W. Hubbard, one of the original members of the Committee has died. However, it appears that * * * in 1943, he purchased $10,000. face amount of debentures which were held by his estate until the confirmation of the plan. There is no question in our minds that that is squarely within the language of Section 249, and that therefore, Mr. Hubbard or his estate can not receive any fee in this case.

"In addition, Mr. Newcombe Baker submits an affidavit in which it is disclosed that he disposed of stock * * *.

"Mr. Baker's mother had some money, and Mr. Baker was a partner of Laird, Bissell & Meeds * * * his mother entrusted apparently her securities transactions to Mr. Baker, and to facilitate his maneuverings in the market, she gave him power of attorney.

"Prior to the inception of this proceeding she had owned a considerable number of shares of stock, some of which were sold prior to the filing of the petition * * * but on April 10, 1941, Mrs. Baker was the

beneficial owner of 20,000 shares of stock which were held in the name of Laird, Bissell & Meeds * * *. They were unquestionably under his control. The affidavit submitted to the Court . indicates that he sometimes consulted his mother, and sometimes he did not. He can not recall whether or not he consulted her in connection with her investment in Equitable Office Building, but, at any rate, in 1943 he sold this stock.

"Now, the Commission believes that if the rule set up by Section 249 is going to be effective at all, it can not be subjected to what Judge Cardozo called the disintegrating erosion of exceptions.

> \* \* \* \* \* \*

"Under the circumstances, the Commission feels that Mr. Baker is not entitled to receive an allowance in this proceeding."

The facts having to do with the Equitable stock holdings of Mrs. Baker who is now deceased, and as related by Charles W. Baker, Jr., who is a brother of Newcombe C. Baker are these:

"Said Frances C. Baker purchased for her own account and with her own funds 20,400 shares of common stock (of the debtor) during the period commencing April 9, 1940 and ended November 14, 1940, at a cost to her of $10,476. In April, 1940, she sold 400 shares of such stock at a net price to her of $234.97, such shares having a cost to her of $212.00. On April 10, 1941, the date of the inception of the proceeding for the reorganization of the debtor, she owned 20,000 shares of the corporation, having a cost to her of $10,264.

"During the period commencing March 3rd, 1943, and ended December 20, 1943, said Frances C. Baker sold for her own account said 20,000 shares of common stock * * * at a net price to her of $12,054.58, and the amount realized upon such sale was received by her for her own account.

· "Said Newcombe C. Baker resigned as a partner of the firm of Laird, Bissell & Meeds because of ill health, on April 5, 1948.

"This affidavit is made by deponent rather than by said Newcombe C. Baker because of the illness of said Newcombe C. Baker."

The attorneys for Mr. Baker contend that he had no interest in his mother's stock either directly or indirectly and that, as a consequence, the statute is inapplicable to the transaction involved. In a brief submitted in support of this contention, counsel seek to distinguish the present situation from the facts that were discussed in such cases as In re Midland United Co., 3 Cir., 159 F.2d 340, 345 and Holman v. Ryon, 61 App.D.C. 10, 56 F.2d 307.

This distinction, in my mind, is exceedingly doubtful. The stock in question was registered in the name of Laird, Bissell & Meeds, of which firm, Mr. Baker was a partner. It was he, acting under his mother's power of attorney, who directed that the stock be sold, but, for some reason, he is unable to recall whether or not it was necessary for him to consult with his mother before taking action in the premises.

Mr. Baker, it will be recalled, was a director of the debtor and, as such, he may be presumed to have had a more or less intimate knowledge of its financial affairs. His mother sold 400 shares of her stock a few months before the reorganization petition was filed. There is no proof as to whether Mr. Baker advised this sale, and I shall not take this sale as a prejudicial circumstance. I say this inasmuch as Mr. Baker did not become a member of the Stockholders' Committee until May 5, 1941.

Thereafter, however, and between 1941 and March 3, 1943, the price of the stock advanced slightly, a few cents per share. In 1943, the debtor's net income declined to $991,000 from $1,084,000 in the preceding twelve months period. In 1943, also, the Trustee, the Securities and Exchange Commission, and the debenture interests, were vociferously contending that "not only was the debtor unable to meet its debts as they matured, but that the aggregate of the debtor's property at a fair valuation was insufficient to pay its debts and was, therefore, insolvent." Indeed, on August 25, 1943, the representative of the Commission stated that there was an equity of not more than $1,500,000 above the first mortgage. At that time, the debenture debt exceeded $5,000,000.

With these facts before him, it is reasonable to suppose that Mr. Baker concluded

that, from the standpoint of his mother's interest, it was to her advantage that her stock be sold, and this was done. In this connection, it is difficult to believe that Mrs. Baker exercised any independent judgment in the premises. She, I have no doubt, was perfectly content to rely upon her son's conclusions and direction, and was willing to acquiesce in whatever he decided to do. In any event, in the absence of any proof to the contrary, I shall assume this to be true. In other words, Mr. Baker was the alter ego of his mother and, at the time he directed that her stock be sold, he was acting in a fiduciary capacity on behalf of common stockholders. It would appear, therefore, that in seeking the protection of his mother, and even if he had no immediate interest in the proceeds of this sale, he brought himself within the inhibitions of Section 249 of the Bankruptcy Act, 11 U.S.C.A. § 649. There was a conflict of interest between Mr. Baker and his fiduciary. Otis & Co. v. Insurance Bldg. Corp., 1 Cir., 110 F.2d 333. For these reasons, Mr. Baker can have no compensation. By the same token, the estate of John A. Hubbard and the firm of Laird, Bissell & Meeds must be barred from sharing in the funds that are here available for distribution.

■ So far as Charles A. Dana is concerned, Mr. Finnigan said:

" * * * the application * * * indicates that Mr. Dana performed services in connection with this proceeding on 77 different days.

"The earlier days, of course, were in urging his counsel to do something about seeing that the Court found an equity for the stock, and the later days were in connection with the committee's and its counsel's attempts to take advantage of what appeared to be a changed situation in the way of underwriting a new plan.

"We believe that Mr. Dana is entitled to compensation and the Commission recommends a fee of $4,000 for him personally * * *

"This fee is somewhat in excess of the amount he would receive as a director's stipend, that is to say that the company pays its directors at the rate of $50 per meeting, and a meeting of a committee, we feel, is something like a directors' meeting, and under that theory he would be entitled as a director to receive $3,800. So, the Commission feels that $4,000 is not only adequate but perhaps generous."

Generally speaking, I think the Commission's approach to Mr. Dana's situation is fair and reasonable. Nevertheless, I have the impression that Mr. Dana was the moving spirit in this Committee, and that he should have an allowance of $6,000.

For the secretarial work which Mr. Torre performed for the Committee, I shall make him an allowance of $250. For similar services performed by Mr. McCain, he may have the sum of $500.

Application of Wickes, Riddell, Bloomer, Jacobi & McGuire, Attorneys for the Common Stockholders' Committee.

■ This firm of attorneys has played an important and creditable part in this administration throughout the years that have elapsed since April 15, 1941.

At the outset of the proceedings, and for several years thereafter, the Trustees, the debenture holders and the Securities and Exchange Commission insisted that the value of the debtor's estate was so low as to make it impossible for the stockholders to participate in any feasible plan of reorganization. Mr. Riddell, a member of the petitioning firm, at all times contended that there was an equity in the premises that should be recognized. I shared this view and, in 1945, or thereabouts, clearly indicated the fact.

On the basis of my determination of the value of the debtor's estate, the 1946 plan of reorganization was evolved. That plan received the approval of the petitioners, as well as that of the Committee, for which they appeared.

Thereafter, and when the 1946 plan was on the eve of consummation, an occurrence took place which, so far as the parties who had been in the picture since 1941 were concerned, was entirely fortuitous. By this I mean, that the offer of the City Investing Company to refinance the needs of the debtor under a plan which, upon payment of par on the debtor's indentures, together with interest thereon, would eliminate the

claims of these security holders. This offer, as the record plainly reveals, was due primarily to the efforts put forth by T. Roland Berner. So far as appears, and without the slightest disparagement of these petitioners, they had nothing to do with the inception of this development. They were quick, nevertheless, to appreciate the possibilities that the City Investing Company proposal offered to the stockholders of the debtor, and they promptly took steps, along with Mr. Berner and McNamara & Seymour, to forestall the 1946 reorganization plan. In this, with the aid of others, they were entirely successful.

When pending reviews of my action, in the Circuit Court of Appeals and the Supreme Court of the United States, the time limit containing the offer of City Investing Company was exceeded, these petitioners participated actively in bringing about the participation of the Wertheim group in the reorganization plan that has now been consummated.

None will deny the value of the services rendered by this firm of attorneys. In support of this statement, I quote from statements made by Mr. Finnigan on behalf of the Securities and Exchange Commission: "I don't think I should refrain from saying that Mr. Riddell's services were highly beneficial, and that the services rendered by him and his firm generally were very skillfully performed. I am frank to say that, in our opinion, Mr. Riddell has done an excellent job."

He then added:

"However, we do not think that the firm's request of $200,000 is within reason, considering the work that he did, and bearing in mind the various factors that I have outlined at the beginning of the proceeding.

"I would like to point out that the time spent was 4,640 hours approximately by members of the firm and their associates. A great deal more of it was spent by partners and associates, as it should have been, because it was work in court and circuit courts and so forth. But I would like to make this point:

"Included in this 4,600 hours are 1,100 hours that we feel are not compensable, and that is because 638 of them were spent in preparing the application of the firm for an allowance, and under our view and the view of the Third Circuit at least, an attorney does not get paid for submitting his bill.

"In addition to that 630 and some odd hours, there were a number of hours in what we regard as noncompensable work. * * * and the fact that it was performed by an attorney, perhaps in an excess of caution, still does not justify compensating the firm on the basis of rewards for legal services.

"Then, a great deal of time was spent, over 1,133 hours, in connection with the unsuccessful appeal for leave to intervene. The compensable hours then would come to about 3,500 in the viewpoint of the Commission instead of the 4,640 requested."

The Commission recommends the petitioners be allowed a fee of $70,000, plus $3,296.88 in disbursements. I will fix the allowance of petitioners at $85,000, and will approve disbursements in the amount stated. Of these amounts petitioners have already received $45,000 for services and the full amount of the disbursements.

### Application of Louis B. Altreuter.

This petitioner, an expert on real estate values in New York City, was retained by the Common Stockholders Committee, in 1944, to make a study of the debtor's property and give expression to his judgment of its value. At the conclusion of his investigation, in which he was aided by the technical staff of Horace S. Ely & Company, a well and favorably known real estate firm with which petitioner is associated as head of its Appraisal Department, he appraised the property at $23,500,000.

Thereafter, on two occasions, Mr. Altreuter testified before me. His evidence was of value in leading me to conclude, as I then personally believed, that the property of the debtor, was worth more than $20,000,000. After considering petitioner's testimony, along with that of Mr. MacRossie and Mr. Snyder, I found its value to be $21,350,000 and then suggested that the stockholders, in my opinion, were entitled to participation in the debtor's plan of reorganization.

In preparing himself to make his appraisal, and to testify in court, petitioner spent about half of his time for a period of four weeks. Counting the time that his staff gave to the inquiry, and adding it to that which Mr. Altreuter gave to the task, a total of 56 days were consumed.

Petitioner asks that he be paid $15,000, the Commission recommends a fee of $3,-000. It would appear from the statistics appearing in Mr. Altreuter's report to the Common Stockholders Committee, that a considerable portion of the work performed by his staff was of a routine character. This is particularly true as to the itemization of matters having to do with the Vacancy Survey of the Real Estate Board of the City of New York, the business of the New York Stock Exchange, the National income, and the assessed value of the debtor's property from 1929, to 1945. For work of this type, compensation cannot be paid on a professional scale. Nevertheless, I am here asked to allow for all services rendered a fee, which, if authorized, would amount to about $278 per day. This request is obviously excessive. Considering that petitioner's time expenditure was little more than fifteen days, and assuming that he should be allowed $100 per day, it would appear that, if I adopt the recommendation of the ·Commission, $1,500, or about $37 per day, could be allocated to petitioner's staff.

Upon full consideration of all these factors, I shall follow the suggestion made by the Commission and fix Mr. Altreuter's fee at $3,000, which he has heretofore received.

### Application of Blake Snyder.

██ Petitioner was retained by the Dana and Baker Stockholders' Committee for the purpose of testifying in this proceeding concerning the effect of their current and prospective economic trends upon the rental income of the debtor's real estate, and concerning the selection of capitalization rates. There was no formal retainer agreement between petitioner and the Committee but it was understood between them that Mr. Snyder's compensation would be such sum as the court might allow from the estate of the debtor.

It appears that this petitioner, in 1937, at the request of the directorate of the debtor, made a study of the problems then confronting the Equitable Office Building Corporation. In preparation for his testimony in this proceeding, Mr. Snyder reviewed the data that he had assembled in 1937, and then, by means of a review of available real estate records over the intervening years, he brought his studies down to date. He also gave consideration to the appraisal reports of Messrs. MacRossie and Altreuter, and to the debtors' tenancies and financial statements. Thereafter, he appeared in court and gave his opinion as to the prospects of rental conditions that the debtor might reasonably anticipate. In this connection, he prepared several charts having to do with such prospects, and these were offered in evidence.

For the services so rendered, Mr. Snyder asks that he be paid the sum of $10,000.

The Securities & Exchange Commission is of the belief that petitioner's testimony was of little, if any, value but says:

"* * * there is no question that he did spend time and that the figures that were prepared for him by the Real Estate Board may have been of some assistance to the court in reaching its ultimate determination.

"In the opinion of the Commission, an adequate fee for Mr. Snyder should not exceed $750."

My own judgment is that this petitioner should be compensated in the sum of $1,000, which has already been paid.

### Application of William P. Doyle.

██ This petitioner, an Illinois resident, formally retained Berner on the morning of July 11, 1946. Whatever appears in the record concerning his early interest in this litigation is reviewed in the discussion of the Berner petition.

The Securities and Exchange Commission has opposed this application for three reasons:

(1) To use his own words, Doyle "wanted the Equitable Office Building to take their reserves to paying off their indebtedness, to paying off the debentures, and let it work itself out." He preferred having

no plan of reorganization, and believed that the eventually consummated plan was only "second best" to his original hope.

The Securities and Exchange Commission maintains that for this reason Doyle should have no allowance, but I confess that I do not fully understand the Commission's reasoning. A reorganization such as this is essentially a compromise proceeding, and allowances can not be restricted to those who supported the final plan, although that consideration may influence the size of the award.

(2) The Commission's second objection is that Doyle was a "willing part(y) to the misuse of inside information that enabled Mr. Buckner to (buy) 10,000 shares of Equitable stock on July 11th, the day that Mr. Berner brought his motion in this court."

The trouble with this contention is that there was no evidence of any connection between this petitioner and any trading that may have been done by Buckner, Hemphill, Noyes & Co., or by any other customer of the brokerage concern. The relationship of a customer to his brokerage house is not so suspiciously close that the customer should be required to prove he had no interest in the broker's sales or purchases.

(3) The Commission's fundamental objection is that petitioner was not Berner's client at all. The Commission maintains that Buckner was the real client, and that Doyle was a mere nominee of Hemphill, Noyes & Co.

Without deciding whether or not Berner did not also represent Buckner, the Commission's argument is not persuasive. Whether a formal test, or one of real interest be used, in the last analysis, Doyle was a client. It is not denied that he personally retained Berner by a telephone call on the morning of July 11th. Neither is it denied that Doyle had expressed serious interest in these proceedings by the 1st of July, and was considering what might be done to upset the Trustee's plan. The record establishes his early conversations with Buckner and Berner, and also his communication to this court. While it may be that Buckner was interested in such a move, and that other customers of Buckner were also interested—on which points I make no findings—nevertheless, it is clear that Doyle was at least a prime cause of Buckner's activities. It is also appropriate to mention here that Berner, representing Doyle, opposed a Hemphill, Noyes proposal to give the management of the building to Charles F. Noyes & Co.

Petitioner has requested $25,000, plus disbursements of $496. It appears that Doyle took a prominent part in the various problems that presented themselves subsequent to his appearance and was of some influence in obtaining the mortgage on which one of the discarded plans was based. But his real service was his initiative in defending the stockholders' rights, by which so much of their equity was saved. For this I shall award him a fee of $10,000, plus disbursements of $496.

## Application of Adelaide H. Knight.

This petitioner is the wife of George W. Knight, who is an assistant to Mr. Buckner of Hemphill, Noyes & Co. George W. Knight testified to his wife's entry into this proceeding as follows: "Mr. Doyle was interested in seeing that Mr. Berner worked on this case, but Mr. Berner said that he needed somebody who would be in New York in the summer, who was a stockholder, and who would be available to sign papers. And at that time Mr. Buckner discussed it with me and my wife has stock, she would be there all summer, so that is how she came into the picture."

The Commission has also charged this petitioner with having been a willing party to the misuse of inside information, but I must reject this argument. Nevertheless, I do agree with the Commission "that the services rendered by Mrs. Knight were services in name only, and, therefore, that she should not receive a fee in this proceeding." I do not doubt that Mrs. Knight expended some effort in signing papers, and perhaps to some extent in familiarizing herself with their contents, but these services essentially were rendered on behalf of persons through whom she came to enter an appearance, rather than for the estate, and I do not clearly see my way to compensate her for them.

Application of T. Roland Berner.

█ In the course of the proceedings, the present petitioner appeared as attorney for Adelaide H. Knight, William P. Doyle, Hemphill, Noyes & Company, and Edward Necarsulmer, holders of common stock of the debtor.

The debtor filed its voluntary petition for reorganization on April 10, 1941. Mr. Berner first appeared in court on July 11, 1946. At that time, a reorganization plan of the Trustee had been approved by the requisite number of holders of the debtor's securities, and had received the confirmation of the court. The time to appeal from the order of confirmation had expired, and the plan was on the eve of consummation.

That last moment was made dramatic by petitioner's sudden appearance with an underwriting offer designed to pay off the debenture holders in full and restore to stockholders the entire equity of the debtor's real estate. As a result of this proposal the consummation of the Trustee's plan was delayed and ultimately frustrated. Further underwriting offers were then received, and eventually a plan was consummated which provided that the stockholders should have 97% of the equity, rather than the approximately 8% which the Trustee's plan had granted them.

This substitution of the final plan for that of the Trustee was not achieved without prodigious labor.

In the course of this opinion, I shall have occasion to discuss petitioner's activities in this court, and in appellate tribunals, together with the difficulties that confronted him in the accomplishment of the purposes he had in mind. His contribution to the final result can hardly be overestimated. The extent and the scope of his efforts can best be appreciated by a review of the itemized list of services which Mr. Berner has submitted, and which, as to the more important contributions, may be summarized as follows.

Opposition to the consummation of the Trustee's 1946 plan, formulation of an alternative, and securing an underwriting to make such alternative feasible; securing a stay of consummation after this Court had denied the application for a modification, by petitions to the Circuit Court of Appeals and the Supreme Court; a successful appeal to the Circuit Court of Appeals from the District Court denial of the application; successful opposition to petitions for certiorari in the Supreme Court. Unsuccessful effort to remove the Trustee. Efforts to dismiss proceedings on ground that debtor was solvent. Successful application to this Court to implement the mandate of the Circuit Court by a sealed bid procedure, and efforts to secure the best possible underwriting, include "the procurement of the bid of Manufacturers Trust Company which * * * served as a model for subsequent bids and modifications * * * The procurement of this bid forced Wertheim & Company to give up their hopes of foreclosing the equity of the common stockholders through their ownership of the debentures." Support of the $2 plan and opposition to the $6 Wertheim plan, and application to the Court to have both plans submitted to stockholders; opposition to having only the $3 plan submitted to stockholders. Procuring a new underwriting offer from Hemphill, Noyes & Company and Charles F. Noyes, forcing the Wertheim-Manufacturers group further to reduce their underwriters' commission by about $200,000. Successful application to disallow interest in excess of 5% simple interest to debenture holders.

While I cannot agree with all of Mr. Berner's conclusions with respect to the matters concerning which he claims credit, the foregoing summary of the extent of his participation in these proceedings is fairly accurate. For what he did, together with his accomplishments, he asks compensation in the sum of $210,000 plus disbursements of $2,020.29.

If I were to detail all the events which have occurred since petitioner's advent into this administration, and were then to appraise the value of each of his achievements, this opinion would be of inordinate length. For that reason, I shall allow the summary, as above set forth, to stand as a reasonably fair epitome of what he did. In addition, it is but fair to say that had it not been for this petitioner, the present plan of reorganization would never have come into being. For a period of about two

years he displayed energy, skill, resourcefulness, and an unflagging persistence— coupled with an impetuosity that at times was amusing, and at others irritating— which were little short of amazing. He may justly be credited with having done more than any other person in preserving for stockholders substantially all of the equity in the debtor's property.

If the matter were to stop here, I should unhesitatingly award him a generous fee. It is a matter of personal regret that this cannot be done. The reason is that both the SEC and counsel for the Dana Stockholders Committee charge, and the record indicates, that, in the course of the proceedings, Mr. Berner's conduct has been such as to disentitle him to compensation under the provisions of Section 249 of Chapter X of the Bankruptcy Act, which reads as follows: "Any persons seeking compensation for services rendered or reimbursement for costs and expenses incurred in a proceeding under this chapter shall file with the court a statement under oath showing the claims against, or stock of the debtor, if any, in which a beneficial interest, direct or indirect, has been acquired or transferred by him or for his account, after the commencement of such proceeding. No compensation or reimbursement shall be allowed to any committee or attorney, or other person acting in the proceedings in a representative or fiduciary capacity, who at any time after assuming to act in such capacity has purchased or sold such claims or stock, or by whom or for whose account such claims or stock have, without the prior consent or subsequent approval of the judge, been otherwise acquired or transferred."

The basic reasons for the result here to be reached are to be found in two episodes in which Berner participated. One of these will be denominated the Peter Bell transaction, the other, the Hanover Development matter.

### The Peter Bell Transaction.

Peter Bell is Berner's brother-in-law. On July 10, 1946, one day before Berner's eleventh hour appearance, Peter Bell bought 20,000 shares of the debtor's common stock. The purchase price was approximately $53,000.

To invoke Section 249 it must be proved that "after assuming to act" in the capacity of attorney, the petitioner made a forbidden sale or purchase. Since the Bell purchase was made on July 10th, and since Berner's appearance, as well as his retainer, as he contends, occurred on July 11th, the first issue for consideration is whether Section 249 is properly applicable to Bell's purchase of stock on July 10th. In order to decide this question, attention must be given to the manner in which Berner first participated in this proceeding.

Petitioner is a friend of one Walker Buckner, a customer's man associated with the stock exchange house of Hemphill, Noyes & Company. Some of Buckner's clients were holders of fairly large blocks of the debtor's common stock. Among these was William P. Doyle, of Chicago, who had purchased 2,000 shares in July, 1945.

According to Berner's testimony, he first became interested in the Equitable problem on the occasion of a visit he paid to Buckner's home sometime after mid-June, 1946. Buckner outlined his clients' points of view and asked Berner to give consideration to their problems. Buckner also told Berner that Doyle was pressing him for some action. At Buckner's insistence, petitioner spoke with Doyle on the telephone some time prior to the July 4 weekend, although Berner does not remember where or when the call was made, or anything more than that he gave Doyle the opinion that he then entertained. In essence this was that unless a multi-million dollar bank loan could be obtained to retrieve the debtor's property, nothing could be done. About this time, although it is not clear exactly when, Buckner told petitioner "that Mr. Doyle wanted an attorney in the situation and he wanted me to act. I think he wanted me to act but I hadn't given any indication that I would act." Doyle and Berner again conversed by telephone on the July 4 weekend, and Berner told Doyle that Equitable was "a dead dog."

Petitioner spent the July 4th weekend at his summer home in Rhode Island. He

returned to New York on Monday, July 8, with the conviction that the way to save the debtor's estate was to obtain an underwriting. His thought was that Buckner "would do a considerable amount about getting that underwriting together." While he did not himself intend to present the matter to the Court, he certainly intended to have it done, and was sure it could be done. Accordingly, he communicated with the Trustee, with the attorneys for the stockholders committee, and with other parties, to induce them to present his proposal, but without success. He also furiously and ably attacked the problem of forming an underwriting syndicate. In the early morning of July 9 (Tuesday) he had a total of 50% commitment from the Hanover Development Corporation, which belonged entirely to his mother-in-law, and from Arnhold Brothers. At 11 o'clock a. m. of that day, Berner saw Mr. Robert Dowling of the City Investing Company, who found Berner's proposal attractive and said that he would submit it to his Board of Directors at 2 p. m. on July 11.

At 2 p. m. on Wednesday, July 10, petitioner learned that the time for the passage of title under the Trustee's plan had been moved ahead 10 days, and was then set for July 11th at 2 o'clock; p. m. Berner immediately advised Mr. Dowling, who promised to hold a meeting of his directors that night, July 10. Petitioner also advised Buckner "that I thought action ought to be taken immediately and I would be willing to act for them if they wanted me to, for Mrs. Knight, and for Mr. Doyle, and I indicated also that if he had—when they —I would rather have a New York plaintiff, too, that I would want someone here where things had to be done in a hurry, and I wanted someone, if Mr. Doyle had any associations or affiliations, I wanted someone to join with him." Petitioner also advised the Court as to the plans he had in mind. As a result of this a hearing was scheduled for 12 o'clock noon on the 11th.

At 4 a. m., Chicago time, on the morning of the 11th, Doyle called Berner who was in New York, from Chicago. At that time Doyle formally retained Berner, and petitioner filed his appearance that very morning, and at noon set forth his startling proposal. Concerning his retainer, Berner testified on cross examination as follows:

"Q. Were you retained prior thereto by Mr. Buckner? A. We had conversations where—as the result of which, I looked into the situation. There was no formal retainer.

Q. What do you mean, you looked into the situation, what did he ask you to do? A. He discussed it with me, as I say, on a friendly basis at his home and I looked at the situation and told him what I thought could be done about it.

Q. Did you appear in these proceedings at any time prior to July 11, 1946, as counsel of record? A. No, I did not appear as counsel of record but I did talk to the Court on July 8th, and 9th and 10th. I think I talked to the Court on each of those days prior to July 11th, but it wasn't until the evening, at about 6:30 or 7:00 P.M. on July 10, that I told the Court that I would present my papers to the Court."

On July 11th, 1946, speaking of Mr. Doyle, petitioner stated to the Court as follows: "He is in Chicago, but I would like to point out one thing that I think your Honor should be apprised of, and that is when the group who had been in this situation, and when they permitted the thing to get to the point where the debtor's estate was being depleted by a plan which takes away the equity, and when the group learned that I was going to appear in this proceeding, and I made no secret of it, I called your Honor, called up on Monday, and asked that the order of confirmation be held up. * * *"

Petitioner also stated: "I was retained last week and I went away over the weekend, and when I got back on Monday I found an order of consummation * * *"

In his argument in behalf of an allowance for the stockholders Doyle and Knight, petitioner said: "Wertheim knew that I was going to move here because a week before I came in, before I knew that I was coming into this proceeding, and before I knew there would be an underwriter, before there was any idea of an underwriter, Wertheim had heard that I was taking a part in this case, and they advised everybody in this financial community, and

562

they were around to see every judge in this court, and asked that the order of confirmation be signed."

Doyle's testimony was in support of that of the petitioner's. It also appeared that Doyle had written to me some time after the Trustee's plan had been confirmed on May 14, 1946, at which time he protested against the treatment afforded stockholders.

The original Doyle letter is in my files and bears the date of July 1, 1946. I think I may also take judicial notice of a letter in my files addressed to me by petitioner under date of July 8, 1946. It reads as follows:

"I represent holders of the common stock of the Equitable Office Building Corporation * * * It was not the intention of my clients to take any part in the proceedings since they felt the interest of the stockholders would be protected by the Court and the Trustees appointed by it.

"However, they feel that the Trustees have not taken proper notice of the tremendous change in real estate values in their amended plan of reorganization and propose to offer an amendment to such plan before the end of this week. The proposed amendment will, in my opinion, add in excess of three million dollars to the value of the estate of the debtor, and it is respectfully requested that no further steps be taken until such time as an amendment to the Trustees' amended plan has been presented to the Court."

The SEC contends that petitioner's real client was Buckner. Without deciding who it was that Berner represented, Buckner or Doyle, it is clear from this record that he was acting in a fiduciary capacity at least as early as July 8th. Furthermore in his numerous conversations with the parties, and with potential underwriters from Monday through Wednesday of that exciting July week, petitioner was acting either as an attorney or, it would appear, was not behaving in a professional manner. I have no doubt of the propriety of Berner's interest during those dates. His actions were definitely those of an attorney representing clients, although not formally retained by anyone. A retainer

need not be formal. Shoup v. Dowsey, Ch. 1944, 134 N.J.Eq. 440, 36 A.2d 66, 85; 7 C.J.S., Attorney and Client, § 65, page 848. The July 8th letter addressed to me, and petitioner's own statements in court on July 11, must quiet any question on this score. Section 249, and the law of trusts therein codified, express an obligation of an attorney which is not contingent on the date of his formal retainer, or his appearance as counsel in court, but is contingent rather on his assumption of the duties of an attorney representing clients.

With these preliminary statements, I turn to the circumstances of Peter Bell's purchase of 20,000 shares of the debtor's stock. The starting point of this inquiry should be the evidence having to do with Bell's financial position.

On August 11, 1941, Bell filed a petition in this court for relief under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. The proceedings closed in November 1942, and had produced a plan by which unsecured creditors were to be paid on a 20% basis. In late 1944, or early 1945, Bell sold his drugstore in New York City. The price was about $60,000 with about $20,000 down; the balance being payable monthly, over a six year span. Bell's principal checking account contained less than $1,000 on July 10, 1946. At the hearings on petitioner's application, Bell testified that he owned and operated the Bell Homeopathic Laboratory, a drug distribution business, in New Jersey. There is no evidence to show the extent of the income derived therefrom.

Peter Bell's account of his stock purchase, which I shall presently set forth, must be considered in the light of the impression he made upon me while on the stand. He was hostile to the SEC, who called him; he chose not to recall much that must have been known to him, and apparently, did not tell the precise truth throughout a good portion of his testimony.

Bell met Berner the night of July 8, 1946, for dinner. Bell did not recall why they had an engagement, labelling the meeting "just a coincidence." He did not remember who initiated the appointment. Neither did he recall the place of meeting. Accord-

ing to Berner, he and Bell dined at Sheepshead Bay, which was close to Bell's home but more than 10 miles from Berner's office. In the course of the meal, Berner told Bell he was on the verge of taking action in the Equitable Office Building matter. Berner didn't tell Bell that it would be a good thing to buy some Equitable stock, but upon hearing what Berner had to say, Bell inquired if there would be any objection on Berner's part if he made a purchase. Berner replied there would be none, but that if Bell made a purchase, he would prefer the transaction to be handled by Hemphill, Noyes & Company. In response to questions as to what Berner said, Bell was vague, if not inarticulate.

Counsel for Berner asked Bell whether Berner told him on Tuesday night (July 9) that he would advise Hemphill, Noyes that Bell would call. Bell answered, "No." When I asked Bell whether, when he talked to Berner that Tuesday night, Berner gave him Buckner's name, Bell answered, "Very likely."

Bell could not recall whether he had spoken with Berner on Wednesday, July 10.

Bell placed his order for 20,000 shares of Equitable by telephone call to Hemphill, Noyes at 9:43 a. m. on July 10, 1946, telling them that he was Berner's brother-in-law.

In the main, Berner's testimony supports that of Bell, but is somewhat more specific. He remembered that Bell called him for dinner on the 8th, and also recalls the restaurant at which they dined. He testified that he spoke to Bell concerning the Equitable situation inasmuch as he was so interested in it that he could converse about nothing else, and also, because he hoped Bell might know some one who would participate in the underwriting. Berner's version of the discussion of a possible purchase by Bell paralleled his brother-in-law's. He told Bell he was sure he could stop the plan, being certain that he could obtain an underwriting. He denied introducing Bell to Buckner, and couldn't recall whether he had mentioned Bell's possible purchase to Buckner. However, it appears from other evidence that Berner did inform Hemphill, Noyes some time between

the market closing on July 9 and 9:43 a. m. on July 10 that Bell might make a purchase. Berner didn't think he had any conversation with Bell between Monday night and the time of the purchase. It appears on the record that, on July 12, 1946, Berner told the court that he did not contact Bell on Tuesday, but spoke to him sometime before 11:30 p. m. on Wednesday.

Bell paid for his stock purchase through the sale of two $10,000 U. S. bonds to Hemphill, Noyes, plus a check for $33,043.73. The bonds were received by Hemphill, Noyes at 2:02 p. m. on July 10th. The check was presented on July 15. The certificates themselves have always remained in the possession of the brokerage house.

The question of who actually paid for the stocks was a central issue at the hearings on allowances. It will be well to discuss the bond transaction first and then that having to do with the check.

The two $10,000 bonds sold to Hemphill, Noyes were purchased by Berner from the Guaranty Trust Co. on November 15, 1945, and apparently were delivered to him. Berner paid for them with two checks for $10,000 each, one drawn on the Central Hanover Bank and Trust Co., and the other on the Chase National Bank, both dated November 15, 1945. Both Berner and Bell testified that the bonds were really Bell's, and were bought with Bell's money. The evidence shows that on November 14, 1945, Berner deposited in the Central Hanover Bank a check from Bell in the sum of $10,200. Berner and Bell testified that Bell gave his brother-in-law $9,800 in cash to cover the remainder. Berner went on to say that out of this fund he deposited $4,700 in his wife's account in the Chase Bank, kept $100 in his pocket for petty cash, and placed $5,000 in his safe deposit box. A Chase bank deposit slip shows that $4,700 in cash was placed in the account of Berner's wife on November 13, 1945. A Berner office record, also in evidence, shows these bonds as belonging to "T. R. B." with "Peter Bell" following in a parenthesis.

Bell testified that Berner advised him that bonds were a good buy at the time. He said that he obtained cash in the sum of $9,800 by way of a loan from his brother

Saul, who is a druggist in Rahway, N. J. Saul Bell testified that he had made such a loan.

The evidence established that these bonds were received at Hemphill, Noyes at 2:02 p. m. on July 10. An additional $80,000 in bonds that must have come from Berner's office was received at the brokerage house for purchase at that very same time. Nevertheless, both Berner and Bell were quite hazy on where the bonds were at any particular time, and as to how they got to Hemphill, Noyes & Company. At one point, Bell said he withdrew his own bonds from his deposit box in the Emigrant Industrial Savings Bank on July 10th. The evidence shows he did visit his box that day. At another place, he said he withdrew the bonds in March for delivery to Berner in connection with a real estate transaction, and did not withdraw them on July 10. The bank's records proved that Bell did not visit his box between February 18, 1946 and June 10, 1946. He didn't know how the bonds got to Hemphill, Noyes. Berner supported the testimony regarding the use of the Bell bonds in a real estate deal in March, 1946, but was equally uncertain with respect to whether he returned them after the deal, or as to whether he or his office received them on July 10, and as to how they got to the brokers.

Next to be considered is the check for $33,043.73. According to Peter Bell, about $12,000 of this sum represented cash received from his brother Saul. A further sum of about $10,000 was borrowed from his brother Alexander, and another $10,000 was derived from a bank loan Peter made on the security of $11,000 in U. S. Treasury bonds.

According to Peter Bell, he went to visit his brother Saul in Rahway on Tuesday morning, July 9th. They discussed the purchase of Equitable stock, and finally decided to buy 20,000 shares as partners. Saul gave Peter $11,700 in cash, which together with the $9,800 Peter had borrowed to buy the bonds, was to be Saul's contribution. Peter was vague on how the cash was produced, but thinks he stayed somewhere else while Saul went to the bank for the money. Peter Bell's deposit slip shows $11,700 cash deposited on July 15, 1946. Peter testified it was not unusual for him to have carried $12,000 cash in his pocket for four days, and that he did carry it.

Saul Bell testified to support his brother. He had, he said, speculated in Equitable Office Building stock in April, 1946. He testified that Peter had visited him in early July, and had told him Equitable was a good buy. " * * * They told me the stock was worth between ten and twelve dollars * * * Peter told me. That is the way it was. I believe the man, and I got it. He said that it is a very good stock, 'You ought to buy it, and soon it would be worth at least $10 a share.'" They decided to buy a certain amount, and Saul gave Peter $11,500 in cash which he had in a strongbox in his own home. He testified he always kept large amounts of cash on his person and in his home, and that his net worth was over $100,000, in addition to his ownership of Equitable stock.

Peter Bell couldn't recall whether or not he visited his brother Alexander in East Orange on that day. East Orange is a 35 minute drive from Rahway, and he thought he probably went the same day. Alexander is also a drug store owner. Peter went to the store, and then the brothers went to Alexander's bank, where Alexander obtained a cashier's check for something over $9,000. Peter was unclear on whether Alexander gave the bank security.

Alexander was not called upon to testify.

There is no doubt but that on July 15, Bell negotiated a $10,000 loan with the Chase National Bank, giving security in the amount of $11,000 Treasury bonds.

Following the reorganization of the debtor, Peter Bell exercised his stock warrants, at a cost of $25,000. Both Peter and Saul testified that the money was borrowed from Alexander, in the form of a check to Saul.

No note, or other writing was submitted in support of any of these transactions among the brothers, and Peter and Saul testified that they never prepared such writings in connection with family matters. No memorandum is in existence to show that Saul is a partner with Peter in the ownership of 28,000 shares of Equitable.

The margin agreement signed by Peter Bell with Hemphill, Noyes, which is a form contract in fine print, states that "no one except myself has an interest in my account or accounts with you."

It remains to be noted that the purchase price for these 20,000 shares was 2⅝, and that on July 12th the high for the stock was 5.

Having observed the witnesses and listened to their testimony I am far from satisfied that this version of the stock purchase is correct. In summing up, counsel for the SEC stated as follows:

"We can't say that any of this money was Mr. Berner's, and he has categorically denied that it was. We have not shown that he had any direct or indirect financial interest in the acquisition of this stock."

Nevertheless, it has not been adequately demonstrated that the true ownership of the stock was in Peter and Saul Bell. I need not do more than enumerate those details of the testimony which cause my doubts: (i) the manner in which the dinner was arranged on July 8; (ii) Bell's financial status; (iii) the haste with which the decision to purchase was made; (iv) the Berner purchase of the bonds, and especially the matter of obtaining the $9,800 in cash; (v) the manner in which funds were obtained from the two brothers; (vi) Bell's story that he carried almost $12,000 cash with him for several days; (vii) the lack of any writing; (viii) the manner in which the bonds were delivered to Hemphill, Noyes & Co.

The obligation of loyalty owed by an attorney for stockholders in a Chapter X proceeding is stated in Section 249 of the Chandler Act. Now, that section embodies the law of trusts. In re Midland United Co., D.C.Del.,1946, 64 F.Supp. 399, 416, same, affirmed, 3 Cir., 1947, 159 F.2d 340, 344, so that we may look to the law of trusts, as well as to Chapter X litigation, properly to locate the burden of persuasion, or discover whether there is a presumption against the attorney, in this matter.

Where a fiduciary has bought property for the trust from his spouse, or has sold trust assets to her, there is every reason to mistrust the transfer. The property sold to the trust, or the purchase money paid for trust assets may really be the trustee's, and not his wife's. Even if not, he may share in the profits. And even if he receives no pecuniary profit, he may be interested in providing his spouse with an opportunity for profit. While the authorities are not in agreement as to the effect of such a transaction, 2 Scott on Trusts, 867, the majority hold that such a transfer is per se violative of the trustee's duty of loyalty, while a minority hold that it is only a suspicious factor which may be overcome by contrary proof. 131 A.L.R. 990, 1940; see Restatement of Trusts, Section 170.

When it is not the spouse but some other relative of the fiduciary who is involved, the cases are agreed that that circumstance does not, without more, void the transfer. Scott on Trusts, Vol. 2, Sec. 170.6, at page 867; In re Minch's Will, Ohio App., Cuyahoga County, 1946, 71 N.E.2d 144. The majority of the decisions simply hold for the fiduciary where the transaction is found to have been fair, Grandy v. Robinson, 1946, 180 Or. 315, 175 P.2d 463; Anderson v. Bean, 1930, 272 Mass. 432, 172 N.E. 647, 72 A.L.R. 959; Robinson v. Ham, 1939, 215 N.C. 24, 200 S.E. 903; Oliphant v. Carr, 1928, 103 N.J.Eq. 165, 142 A. 430, affirmed 1930, 106 N.J.Eq. 283, 151 A. 907, and against him if unfair. Pevehouse v. Adams, 1915, 52 Okl. 495, 153 P. 65. The most common statement is that the relationship is but one factor, among others, to be weighed in resolving the issue, Grandy v. Robinson, supra, which frequently has been framed in terms of fraud. Cain v. McGeenty, 1889, 41 Minn. 194, 42 N.W. 933. There is little explicit consideration of what is a proper solution when it is not clear whether or not the transaction is fair. However, the law seems to be clear that the burden of proof of loyalty rests with the fiduciary, In re Minch's Will, supra, In re Segal's Estate, Sur.Ct., Kings County, 1939, 170 Misc. 673, 11 N.Y.S.2d 306, 309, and there have been statements that, on the showing of such a relationship, the fiduciary must produce positive proof of fairness if he is to prevail. Thus it was said in In re Segal's Estate, supra, where an executor transferred property to his son:

"The transaction must be declared void at the election of the cestui que trust unless conclusively demonstrated to have been made for a full consideration under circumstances which preclude the possibility of any improper advantage to the individual fiduciary himself. * * *

"Whereas the burden of proof no doubt rested on the executors to demonstrate that the fair market value was actually received, they made a prima facie showing in this regard * * *."

See also In re Hay's Guardianship, 1932, 37 N.M. 55, 17 P.2d 943; Parsons v. Wysor, 1942, 180 Va. 84, 21 S.E.2d 753.

█ In Chapter X litigation, the petitioner has the burden of proof. "The claimant * * * has the burden of proving their worth. Furthermore, 'reasonable compensation for services rendered' necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act." Woods v. City Bank Co., 1941, 312 U.S. 262, 61 S.Ct. 493, 497, 85 L.Ed. 820. As stated by Collier, the rule is as follows: "The burden is on each claimant to demonstrate that his claim is within the purview of the statute and is entitled to allowance." 6, Collier on Bankruptcy, Section 13.02, page 4499.

█ Section 249 has been before the courts in a number of instances. There is no doubt that "Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation". Woods v. City Bank Co., 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L. Ed. 820. The problem is, what is an "actual conflict of interests"? When the fiduciary was president of a corporation which traded in the stock of the debtor, no allowance was awarded. In re Midland United Co., D.C.Del.1946, 64 F.Supp. 399, 417. When fiduciaries were members of brokerage firms which traded in the debtor's securities, but the transactions were, so far as it appeared, in the ordinary course of business and not for the account of the partners, an allowance could be had. In re Midland United Co., supra, 64 F.Supp. at page 414. An allowance was refused to the chairman of a preferred stockholders committee who was a member of a broker-

age firm which traded in the reorganized stock for its own account. In re Mountain States Power Co., 3 Cir., 1941, 118 F.2d 405. A similar result was reached upon the application of a brokerage house which traded in the stock and also functioned as a bondholders' protective committee. Otis & Co. v. Insurance Bldg. Co., 1 Cir., 1940, 110 F.2d 333. Two lawyers associated in the same firm, who inadvertently representing conflicting interests could not receive a fee. In re Midland United, supra, 64 F.Supp. at page 406. When a partner in a law firm was barred by Section 249, the firm was also barred. In re Los Angeles Lumber Products Co., D.C.Cal.1941, 37 F.Supp. 708. A lawyer was barred when he had traded while acting as representative for certain interests although he did not trade when representing a new client, for which later services he sought an allowance. In re Reynolds Investing Co., 3 Cir., 1942, 130 F.2d 60. In Woods v. City Bank Co., 1941, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, an indenture trustee, a bondholders' committee, and the committee's counsel, were all denied compensation. The committee was in substance a part of the indenture trustee's reorganization division; two of its officers were officers of the indenture trustee, and two were officers or employees of one of the principal underwriters of the bonds. Also, the indenture trustee and committee members acted in similar capacities for neighboring apartment properties, and there were dealings between the properties that were attacked as unfair. Counsel to the committee was also counsel to the indenture trustee, and to the trustee and committees for the neighboring properties, and had also been counsel for an underwriter whose prospectus was attacked in the proceedings. When the applicant was the father of an officer of the debtor, but it appeared that the father's purchases were made with his own funds and for his sole account, the application was not denied. In re Philadelphia & Western Ry. Co., D.C.E.D.Pa.1946, 64 F.Supp. 738.

Four cases have discussed trading by a wife. In Re Philadelphia & Reading Coal & Iron Co., D.C.E.D.Pa.1946, 61 F.Supp. 120, 128, the court accepted the husband's testimony that "he did not know of it, did

not advise her in connection with it and never discussed with her the affairs of the Company," and granted the allowance. On the other hand, the mere fact of trading by the wife prohibited an allowance in Re Inland Gas Corp., D.C.Ky.1947, 73 F. Supp. 785. No allowance was made when it was clear that the husband controlled the investment and the profits were used to pay family expenses. In re Midland United Co., supra, 64 F.Supp. at page 413. And when the wife's trading was with the petitioner's "entire approval and knowledge," no compensation could be ordered. In re Midland United Co., 3 Cir., 1946, 159 F.2d 340, 342.

Both the Pennsylvania cases holding for the petitioner were decided by Judge Kirkpatrick, and in each of them the Court affirmatively found that the petitioner had no interest in his relative's trading, and, in one, that he had no knowledge of it. The other case permitting the allowance involved ordinary customers' accounts in a brokerage firm.

My summarization of the authorities is as follows: Where the letter of Section 249 is offended, there is no room for an allowance. In re 188 Randolph Bldg. Corp., 7 Cir., 1945, 151 F.2d 357; In re Arcade Malleable Iron Co., D.C.Mass. 1940, 35 F.Supp. 461; In re Consolidated Rock Products Co., D.C.Cal.1941, 36 F. Supp. 912. Where petitioner represents opposing interests, either within the same reorganization, In re Midland United, 64 F.Supp. at page 406; two lawyers in the same firm, or interests outside the reorganization opposing the interest represented in the reorganization, Woods v. City Bank: the committee's counsel, there is a plain conflict of interests. Similarly, where the fiduciary profited from his wife's trading, In re Midland United, 64 F.Supp. at page 413, or was interested in a brokerage house which traded for the firm's account (brokerage cases, supra). It is not necessary, however, to demonstrate this much in order to defeat the allowance here requested. If one with whom the petitioner is associated in a business, In re Midland United, 64 F.Supp. at page 417: president of corporation which traded; In re Los Angeles Lumber Products Co., or family way, In re Inland Gas Corp., has traded in the debtor's claims or stock, an allowance should be denied. This, of course, is upon the assumption that the relationship between the parties is itself so close as to necessitate no further proof that an inside position has been abused. Otherwise, the circumvention of public policy might easily result. Where, although the relationship is not considered to be so close, it is sufficiently close, that in the circumstances of the particular case the same policy reason nevertheless requires the prohibition of an allowance, the same result follows. In re Midland United, 3 Cir., 159 F.2d 340. If the case be considered as being one of the latter character, where the relationship does not itself condemn without more, it is for the court to evaluate the proximity of the parties, and the circumstances surrounding the individual transaction. Of course, the problem here would be much simpler if the precedents all evaluated a wife's relationship, or that of an in-law relationship, with the same weight, but that is not the case. The "loyal trustee" becomes something like the "reasonable man" of the law of torts, though he must tread a narrower path.

Under these authorities, I must find against petitioner. It is immaterial whether I say that he has the burden of proof, or that there is a presumption against him, or whether he must be denied compensation because his brother-in-law's transactions preclude compensation in circumstances such as these. Of course, loyalty consists of an infinite number of negatives, and the fiduciary cannot be required to prove them all. And when there is a transfer of trust property or money from or to a brother-in-law of the trustee, or trading in the debtor's claims or stock by a brother-in-law of an attorney in a reorganization, the circumstance is not sufficient of itself to surcharge the trustee or veto an allowance for the attorney. But the relationship is one fact to be considered, to be estimated in the individual case, and where as here, the circumstances revealed on the trial, are such as not to satisfy the court as to the attorney's loyalty, he may not have an allowance.

### The Hanover Development Matter.

On July 11, 1946, when Berner presented his first underwriting offer to the court he stated as follows: " * * * in order that there be no complaint from any of the senior securities that they are not being well treated, and that this is a nebulous plan, we have obtained an underwriting agreement from City Investing Company whereby they have agreed to subscribe to all (sic.) subscribed shares, and this company is receiving as compensation for doing that the difference between the 1,018,000 shares and the 862,000 shares added together with the 86,000 that they be given on the 10 for one basis, and that leaves roughly 69,000 as an underwriting commission. * * * "

In truth, although Berner did not disclose it at the time, and the fact did not appear until much later, the underwriting presented was a syndicate consisting of City Investing Co. (50%), Arnhold Brothers and Graham-Newman Corp. (partners in 16⅔%), and the Hanover Development Corp. (33⅓%). As the commission provided, Hanover would have received 22,331 shares, which would have been worth in the neighborhood of $100,000.

The Hanover Corporation was at that time owned exclusively, as has previously been stated, by Berner's mother-in-law. Hanover's office is in Berner's office and Berner helped incorporate it in March, 1946. Berner was a nominal officer named in the certificate of incorporation, and remained as such until June, 1946. Berner also held the position of director until the first annual meeting of stockholders, which occurred in April, 1947. Berner does not recall ever having done anything as an officer or director, and never received any compensation from Hanover. He never acted as its counsel.

After the denial of Berner's motion, an appeal was taken to the Circuit Court of Appeals, and during its pendency, this first underwriting offer expired.

The SEC finds an obvious conflict of interest between the underwriters and the corporation as to the size of the commission, and recommends that on this account compensation be denied to Berner.

Berner insists that he acted both wisely and properly in this matter. When he returned to New York on July 8, 1946, he needed to organize an underwriting, and to do it in a great hurry. This was not easy. On July 8 or 9, in order to "get the ball rolling," he approached his mother-in-law. She was not interested so much in the possible profit as in the danger of loss. He assured her on this, and she agreed to come in, apparently to a maximum 50%, on the same basis as other business people would require for their participation.

A tentative commitment was obtained, or had already been received, from Arnhold. Graham-Newman was a partner with Arnhold, but the latter refused to divulge that name to Berner. Similarly, Berner did not divulge the Arnhold and Graham-Newman participation to City Investing, which finally spoke for 50% on the evening of July 10. It is said that this secrecy was imposed by the fear of antagonizing the powerful Wertheim interests.

According to Berner, the offer was presented solely in the name of City Investing Company, both because Arnhold and Graham-Newman desired that their identities be withheld, and because City's financial resources were unquestionable, and it was obviously desirable to make as impressive an offer as possible.

Berner contends there was no self-serving because he had no interest in Hanover, and that there was no representation of conflicting interests inasmuch as he did not represent Hanover. He argues further that there was no conflict of interests between Hanover and the stockholders, so that in no event could there be self-serving at their expense, or the representation of conflicting interests. I will discuss this last point first.

Petitioner's thesis is that far from opposing the stockholders' interests, Hanover was their most valuable "tool". It is urged that the Hanover underwriting was not presented with the intention that it would be accepted, but was only an instrument to prevent consummation and permit new and better offers to be made.

"The role of Hanover was that of a tool of the stockholders, stepping in where com-

mercial underwriters refused to tread. Hanover was not in the securities or underwriting business. Its participation in 1946 was occasioned by the refusal of regular business houses to offer a full underwriting. It agreed to act as a catalytic agent toward the filling in of an underwriting group not on promises of profit but on assurances against probable loss * * *"

"* * * before the decision of the Circuit Court of Appeals in the Doyle appeal and its confirmation by the Supreme Court of the United States, any potential underwriter and the stockholders were both in the same leaky boat, the sinking of which would be forestalled only by final judicial order that the confirmed plan be reopened."

The underwriting offer is compared to a loan from a trustee to his trust.

Petitioner's principal reliance is on the case of Cromwell v. Curtis, 2 Cir., 1938, 99 F.2d 810, 811. There an allowance was permitted to Sullivan & Cromwell although that firm represented the debtor and was counsel for a bondholders' committee at one and the same time. As to the period 1932-1936 the Court said: "* * * there was no conflict of interest whatever. The trustee's leave to foreclose was revoked without objection, and all efforts to reorganize were suspended for four years, because everybody knew that nothing could be done but to hold off executions and accumulate cash until the emergency loans had been cleared away. Even though the committee was, as it was, gathering up bonds through that period, the bondholders and the shareholders were in one boat and that a very leaky one; their interests were common and there can be no valid objection to the attorneys for the company being paid for whatever they did to keep the craft afloat."

As to the period when the reorganization began to make headway, the Court said: "But here there was no closed transaction: the plan did not purport to conclude the bondholders or the shareholders; it was purely tentative, put forward as a mere proposal for the consideration of the court after hearings of which everybody interested was to have notice. After they had been heard, the court was to scrutinize and approve the structure of the new cor-

poration * * *. Upon that hearing any conflict of loyalty would become apparent at once: the judge knew whom Sullivan and Cromwell had represented, and could measure how far that could have resulted unfavorably to either principal. It has never been the law that the court may not approve such transactions when they are above-board; on the contrary they have gone through in a number of instances, even when the trustee was personally and pecuniarily interested. * * * We hold therefore that the court's approval of the plan removed any question touching suppositious conflicts of interest, and with it any possible infirmity in the right to allowances of the committee and its attorneys."

The conclusion on this argument must go against the petitioner. I find no parallel with the 1932-1936 period in the Cromwell case, where there was no conflict of interest whatever. Berner maintains that the 1946 offer was "a mere demonstration of an equity value, a showing that there was something justifying at least a reconsideration." True, the stockholders were interested in such a demonstration forestalling confirmation. Further, Berner himself may have fully expected that eventually other offers would be made and this first one not accepted. But what the Cromwell case requires is an identity of interest among the interested parties, not a belief in the mind of the attorney that there was a strict identity. Clearly the members of the underwriting syndicate with the possible exception of Hanover, did not feel they were making a mere demonstration. They made a serious offer looking toward acceptance. Their interest was not in saving the stockholders' equity, not merely in preventing confirmation, but in obtaining the underwriting commission. In the size of that commission there was a conflict of interest. When Hanover joined in that underwriting it assumed a conflicting interest.

It is to be pointed out that the very success of the July 11 offer as a demonstration depended upon its appearing as one intended to be taken seriously. As Berner himself said, the only way confirmation could have been prevented was to bring in an underwriting offer. And when the Court of Appeals reversed the order refus-

ing to entertain Berner's plan, Knight & Doyle v. Wertheim & Co., 2 Cir., 1946, 158 F.2d 838, certiorari denied McGuire v. Equitable Office Bldg. Corp., 1947, 331 U.S. 818, 67 S.Ct. 1307, 1308, 91 L.Ed. 1836, on the ground of abuse of discretion, it did so not because Berner had stated to this court that he thought he could obtain such an offer, but because he had obtained one. I do not doubt that the result would have been otherwise had Berner appeared on July 11 with a mere hope for an underwriting. In short, the offer was taken seriously because it was seriously made, looking toward acceptance. It was not for Berner, but for the Court, to evaluate the plan on the basis of the Hanover participation.

Berner maintains there was no duty of disclosure until the court considered the merits of the plan. However, I cannot but think that the merits were necessarily considered by the appellate tribunal, though not as narrowly as the District Court would be obliged to study them on an actual presentation of the plan for approval.

As to the second portion of the Cromwell opinion, I do not find that it is here applicable. In that case, there was full disclosure and the plan presented was approved by the court. Here there was no disclosure, and the plan was not approved, and most probably would not have been because of the size of the commission.

Aside from this defense, Berner urges that he must be compensated unless he had a pecuniary interest in Hanover, or represented Hanover. As we have seen, it is not necessary to prove so much. Trading, and perhaps even the making of an underwriting offer, by one's mother-in-law would not by itself be a bar to an allowance. However, such an offer is a bar in the circumstances of this case. Petitioner's mother-in-law stood to profit to the extent of approximately $100,000 if this plan had been effectuated. Interested parties might have considered the fee excessive, and detrimental to stockholders. Petitioner's mother-in-law gained her interest in these proceedings not as an independent financier, but on petitioner's inducement. And petitioner, with knowledge of that interest, failed to disclose it to the court when he announced the offer. A court of equity, charged with enforcing fiduciary obligations, should not grant an allowance in such a situation. It is not necessary that Berner should have had a pecuniary interest in the underwriting, when the connection with this offer by his mother-in-law was so close. Nor do I believe that petitioner can rely on the rules governing loans by a trustee to his trust. No authority holds that a loan at an excessive rate without disclosing the trustee's interest will win court approval at a subsequent accounting. See 4 Bogert on Trusts and Trustees, § 971.

The petitioner may have no allowance.

### Application of Herman B. Zipser.

 Early in this administration, this applicant, representing a client who held 300 shares of the debtor, asked that he "receive notice of all matters arising out of this proceeding, and that such be given to Herman B. Zipser, as attorney for said stockholder." The request was granted.

Thereafter, Mr. Zipser, from time to time, attended conferences at the office of various parties in interest, and appeared at a number, if not all the hearings held before the court. So far as I recall, he took little, if any, affirmative action in any of them. As the petition discloses, Mr. Zipser's client "was in no position to finance the required litigation, nor was his interest sufficient to proceed alone."

In 1945, petitioner's client sold his stock in the debtor corporation. Thereupon, Mr. Zipser wrote a letter to the Trustee in which he indicated that he would like his name crossed off the list of those who were entitled to receive notice in the proceedings, and asked when he might be paid for his services. Payment for any services that he may have rendered could not, of course, be paid without the approval of the court. Petitioner now asks that he be paid $5,000. Notwithstanding the request or suggestion that papers in this proceeding be not served upon him after the date when petitioner's client sold his stock, it would appear that he continued to receive them. In any event, in July, 1946, when Mr. Berner began to take an active part in these proceedings, Mr. Zipser seems to have had a complete

file of all documents in the proceeding. Through some circumstance, Mr. Berner got in touch with Mr. Zipser and the latter placed his files at the disposal of Mr. Berner. It appears, also, that it was Mr. Zipser who first informed Mr. Berner that the date on which the trustees' plan of reorganization was to be consummated had been advanced, and this led to summary action by Mr. Berner. Had it not been for this information so transmitted to Mr. Berner, it is possible that the reorganization now in effect would never have eventuated.

Aside from this, it does not appear that Mr. Zipser has contributed anything to the reorganization proceedings. The fact remains, however, that the information given to Mr. Berner enabled him quickly to be apprised of the entire situation and to take action accordingly.

For this reason, I shall grant an allowance to Mr. Zipser in the sum of $1,000.

### Application of Aranow, Brodsky, Einhorn and Dann.

According to the petition now before me, the services rendered by this firm of attorneys were about as follows:

In mid-July, 1947, Mr. Aranow was consulted by Louis W. Abrons, who held 10,000 shares of the debtor's corporate stock, in reference to its reorganization proceedings. Thereupon, Mr. Aranow familiarized himself with respect to what had happened thereon, and the then status of the debtor. On July 22nd, he attended a hearing before the Court and filed notice of his appearance as an attorney in interest. At that time he took note of the comments and criticisms of the Securities and Exchange Commission regarding the proposed $6 plan that had been submitted by Wertheim, and also the $2 plan suggested by Manufacturers Trust Company. He then made an analysis of what he had heard.

The next day Mr. Aranow again appeared in Court, at which time amendments to each of the two plans under consideration were proposed. On that occasion, also, the Wertheim group submitted an alternative $2 plan. Following this hearing, he conferred with Mr. Abrons, and prepared detailed memoranda of the problems involved.

On August 4th, Mr. Aranow again came to Court. He did so at the request of Louis J. Horowitz, as well as that of Mr. Abrons. Mr. Horowitz was the owner of 5,000 shares of Equitable Office Building stock. He was well acquainted with its property inasmuch as he had actively participated in the creation of the venture in 1913. It was then understood among these persons that Mr. Aranow and his firm would look to the estate for an allowance of compensation in the event that it received benefit from what petitioner accomplished.

Subsequent to this hearing, Mr. Aranow conferred with his clients in an effort to determine if they could evolve a plan of reorganization that would be superior to those then receiving attention.

On August 12th, these three gentlemen visited the local office of the Commission and talked with two of its representatives— Messrs. Finnigan and Galaryi. Mr. Schanzer was also present on behalf of the Trustee. A general discussion was had as to the affairs of the debtor, and an effort was made to formulate a plan that would be less expensive than any of those under consideration. Messrs. Horowitz and Abrons took occasion to express their views to the effect that it was unwise to attempt to refinance the mortgage held by the Equitable Life Assurance Society during the pendency of the debtor's bankruptcy.

The next day Mr. Aranow again talked with his clients. It was then decided to induce Carl M. Loeb Rhoades & Company to underwrite a stock issue without any compensation other than the right to acquire unsubscribed shares at the subscription price. Conferences were thereafter held with the aforementioned financial house and its legal representative. The parties also enlisted the aid of Samuel Kronsky, a mortgage broker, in order to bring about a modification of the existing terms of the mortgage held by the Equitable Life Assurance Society.

On August 14, Mr. Dann of petitioner's firm, together with Messrs. Abrons and Kronsky, appeared in Court. A representative of Rhoades & Company was also pres-

ent. After argument was heard concerning the merits of the pending plans, the hearing was adjourned to August 21st. Meanwhile, talks were had in an effort to work out a plan along the lines suggested by Messrs. Horowitz and Abrons. In this connection, conferences were had with the Trustee, Mr. Duncan, Mr. Schanzer and Mr. Berner. At the hearing on August 21st, Mr. Dann was present. On that day, someone suggested that the Wertheim group and the Manufacturers Trust Company might jointly support a reorganization plan. Between that date and August 27th, when the next hearing was to be held, Mr. Dann advised Mr. Berner of the plan that Horowitz and Abrons were trying to develop and that Rhoades & Company might be the principal underwriter. Mr. Dann attended the hearing on August 27th, and there heard Mr. Berner tell the Court of his conversation with Dann concerning the underwriting proposed. In response to an inquiry by the Court, the latter stated he was not in a position to make a firm offer, that certain negotiations were in progress; that Mr. Horowitz was interested in the matter, and that while he had no wish to compete with underwriters, he did desire that stockholders should have the best possible plan without the expense of excessive underwriting costs.

On being asked how much time would be required to complete the negotiations then in process, Mr. Dann asked for a short adjournment of the hearing. The matter was then postponed to September 10th. Following Labor Day, 1947, which fell on September 6th, Mr. Aranow and Mr. Dann were engaged daily in their effort to develop a plan under which the underwriter would request no compensation whatsoever, except the right to acquire unsubscribed shares at the subscription price. In connection with this effort, it was a condition of the participation of Rhoades & Company, that Messrs. Horowitz and Abrons should also personally participate in the underwriting. And this they agreed to do even though neither of these men was engaged in such activities.

Consultations were held with representatives of the Equitable Life Assurance Society with a view of modifying the terms of its mortgage. From these conversations it was believed that this purpose could be achieved. The persons advocating the plan then conferred with officials of the New York Trust Company in order to obtain a bank loan. That company informally committed itself to a loan of $1,500,000 at 3½%, the same to be amortized at the rate of $100,000 per annum.

On the assumption that the transaction, above stated, could be consummated, a plan was evolved to raise the new capital required by a stock issue at a price of $3 per share. The plan's major feature was an underwriting of the character already described.

On September 10th, the persons advocating such plan gathered together to put it in detailed form. They had scarcely met when word was received from Equitable Life Assurance Society to the effect that it would not modify the terms of its mortgage. This news served to remove the main foundation on which the plan had been built.

Notwithstanding, the parties were not dismayed. They immediately devised a new arrangement. It was their idea that if the existing mortgage were permitted to remain undisturbed for the time being, the same would be refinanced following the reorganization. Funds necessary to pay the claims of debenture holders and reorganization expenses, it was thought, might be raised by offering stock to stockholders at $2.50 per share, and by obtaining a bank loan of $2,000,000. In order to secure such loan, Messrs. Horowitz and Abrons, together with other members of the underwriting group, were obliged to agree that they would personally advance $500,000 of the $2,000,000 loan, and that they should not be entitled to repayment until the lending bank had been repaid in full.

In order to provide an inducement for this personal advance of a half million dollars, and to assume the obligation of underwriters, it was necessary to modify the provision of the reorganization plan with respect to the compensation of the underwriters. This change was that the underwriter should be guaranteed the right to purchase 60,000 shares of stock at the

subscription price. If that number of shares should not be available after subscription by bondholders, the underwriter should have the privilege to purchase additional shares so that in any event, they could have 60,000 shares.

On September 10th, this plan was submitted to the Court. It was accompanied by a certified check of $100,000 as an evidence of good faith. On the same day, the Court was advised that certain persons of the Manufacturers Trust Company underwriting group had joined forces with the Wertheim group. The plan that these persons first suggested was, that as underwriters, they should receive by way of compensation 45,000 free shares of stock and have, in addition, the right to purchase unsubscribed shares at $3 per share.

The plans so offered were referred to the Securities and Exchange Commission for analysis and report. While there under advisement, Mr. Aranow discussed the feasibility of the Horowitz-Abrons plan with the Commission's representatives. In order, apparently, to overcome criticism of such plan by the Commission's staff, he went to New York Trust Company to induce it to waive a yearly fixed payment of $100,000 on account of its loan, and to agree that prepayment of the entire loan prior to the expiration of five years was entirely contingent upon the earnings of the reorganized company. The Trust Company was unwilling, however, to extend the maturity of the loan beyond a maximum of five years.

Upon the occurrence of this development, Mr. Aranow persuaded the underwriters of the plan to extend their proposed participation in the bank loan for a period that would extend beyond five years.

Nevertheless, on September 12th, when both Messrs. Aranow and Dann were in Court, the Commission's representative, Mr. Finnigan, stated that it regarded the Horowitz-Abrons plan as unfeasible. This was due, in part at least, to the refusal of the New York Trust Company to agree to a loan of more than five years. This representative also said that the Commission believed that the new Wertheim plan was feasible. He likewise declared that another proposal, known as the Hemphill-Noyes plan, was also feasible.

The Court was told, in addition, that the proponents of the Wertheim plan had agreed to limit the free shares of new stock to be issued to them to 35,000. Mr. Finnigan then added that the Commission would be pleased to have the Wertheim plan amended so as to eliminate any provision for free shares of stock and to substitute therefor the stock compensation formula set forth in the Horowitz-Abrons plan. Inquiry being made of the attorney for the Wertheim interests as to whether they were willing to accept this amendment, the Court was informed, following a conference of the attorney and his clients, that such would be the case provided that no other plan than theirs would be submitted to stockholders. Upon the Court's assent to this condition, the Wertheim plan was changed in the particulars above stated.

Following the hearing of September 12, Mr. Aranow studied the orders that were designed to carry out the Court's decision, together with the Wertheim agreement. In connection therewith, he attended a conference of all interested parties that was held in my Chambers.

Thereafter, accompanied by Mr. Dann, he appeared in Court and opposed a request of the Wertheim group that it be permitted to employ professional solicitors to seek votes of stockholders in support of its plan. Mr. Dann appeared at Court hearings on September 26th, October 14th and October 18th.

On October 24th, Mr. Aranow attended Court and there heard the Trustees' announcement as to the result of the balloting by stockholders. In the course of this hearing, Maurice Wertheim was called to the witness stand for examination by Mr. Berner. Mr. Aranow also questioned the witness and seems to have established that Mr. Horowitz did not vote against the plan for the reason that it contained the Horowitz-Abrons compensation formula.

On October 30th, Mr. Schanzer requested Mr. Aranow to ascertain if Mr. Horowitz would be willing to serve as a director of the reorganized company. Mr. Aranow communicated with Mr. Horowitz, who was

then in Florida. He, however, did not wish to act in such capacity, and Mr. Aranow so informed Mr. Duncan.

Mr. Aranow attended hearings on November 18th and December 16th. On one of these dates he told the Court and interested parties that his clients would not appeal from the Court's order of approval of the Wertheim plan. At a later date, he signed a stipulation to that effect.

In performing the services above outlined, Messrs. Aranow and Dann, together with other members of their firm, spent approximately 250 hours. For the work in which they engaged, I am requested to allow these petitioners a fee of $25,000. In other words, they wish to be paid at the rate of $100 per hour.

Petitioner's valuation of the worth of their services is based upon their assumption that had it not been for them, the Court would, or might have given approval to Wertheim's original request to allow them a compensation of 45,000 free shares of stock, and that, as a result of their stand upon this matter, the estate has been saved a sum ranging somewhere between $180,000 and $400,000.

In commenting on the instant application, Mr. Finnigan said:

"Incidentally, I might point out that Mr. Horowitz was the same Mr. Horowitz who was at one time a stockholder back in 1925, and against whom Mr. Bernstein still thinks there may be a cause of action.

"They bought the stock in 1947, in July * * * after the opening of the bids for the purpose of offering a plan which would not require so large an underwriting fee as any of the plans then before the Court. The commission provided for was merely the right to buy, at the same price as it was offered to the stockholders 60,000 shares of new stock; that is to say, if the stockholders did not subscribe to enough shares to use up all the shares, they would have 60,000 shares, and if the stockholders all exercised their rights, an additional number of shares to make up 60,000 would be issued, and it was a very good idea. It was so good that your Honor suggested it to the ultimate underwriters, and they accepted it.

"However, * * * one does not pay an attorney whose benefit to the estate is incidental or collateral to his representation of a client who has a motive, whether selfish or philanthropic, but a motive different from the motives of the other parties to the proceeding.

"Now, frankly, Messrs. Abrons and Horowitz were in here to get this underwriting commission. I don't think they ever concealed that fact. That was the only possible interest they might have in it, or they would not have bought the stock in July of 1947, and under those circumstances, since that is the one thing, the only thing, that Mr. Aranow points to as a beneficial service to the estate, I think it is obvious that it is collateral and incidental, and under the circumstances, that there is no right in Mr. Aranow's firm to receive any compensation.

"I would like to make the additional point that it was really the client's idea, and not Mr. Aranow's, this underwriting commission, in the first place, so if anyone were to be paid for thinking up that ingenious scheme, it would have to be Messrs. Abrons and Horowitz.

"I, therefore, should say again that the Commission recommends no allowance to this firm."

In my opinion, the position taken by Mr. Finnigan is seriously to be considered. Mr. Aranow and Mr. Dann were the advocates for a group of persons who, for their own interests—a motive not at all improper—undertook to present a plan that would appeal to the Court, and which would, in addition, be acceptable to stockholders. Believing in the potentialities of the debtor's real estate, and being desirous of profiting therefrom, the Abrons-Horowitz group, insofar as underwriting compensation was concerned, was willing to overbid the proponents of the Wertheim plan of reorganization. The attractiveness of the proposed plan then before the Court became —as it were—a matter of competition. The Wertheim group—wishing to become the successful bidder—agreed to accept a feature of the Abrons-Horowitz plan, which it was believed would find favor with the Court. So far as I know, it has never been supposed that a bidder at an auction sale

who, in competition with others, runs up the price of property to a substantial sum, and who finally is outbidden by a competitor, is entitled to compensation for the ultimate price at which the chattel is knocked down.

From the standpoint of analogy, the situation in which the Abrons-Horowitz underwriting syndicate, and that headed by Mr. Wertheim, found themselves at the hearings on their respective plans, was very similar to the illustration to which attention has just been called.

Furthermore, the assumption that the Court, had it not been for the underwriting proposal of the Abrons-Horowitz group, would have sanctioned the underwriting compensation originally set forth in the Wertheim plan, is without the slightest foundation. Whatever may be the shortsightedness of Judges with respect to business and financial transactions, it is, nevertheless, the fact that—occasionally at least—they are not prone to dispose of the corpus of a trust at an undue sacrifice.

While I have no wish to disparage any contribution that the Abrons-Horowitz groups may have made to the favorable termination of this proceeding—if such it be—and able and diligent as were Messrs. Aranow and Dann in the representation of their clients—I am unable to find or devise any legal principle whereby these petitioners can receive compensation from this estate. The petition, accordingly, must be denied.

Application of Brooks, Harvey & Co. Inc. and Urban Servicing Company for Brokerage Commission With Respect to the Mortgage Modification Executed by the Debtor and the Trustee with the John Hancock Mutual Life Insurance Company.

These petitioners assert that, through their effort, the loan made to the reorganized company by the above named insurance company was obtained. In a letter addressed to the Trustee, dated January 5, 1948, the petitioners said:

"We * * * take this occasion to present to you * * * our claim for brokerage commission in connection with the procuring of the loan of $14,750,000.

"As you know, we are licensed brokers. In co-operation with each other we procured the commitment of that insurance company which resulted in consummating the loan aforesaid.

"Under ordinary circumstances the commission to which we would be entitled for procuring this loan would be $147,500. However, as we have previously advised you, we wish to meet the exigencies of the situation and, if we may do so without prejudice to our claim, take this occasion to advise you that we would probably be willing to accept such compensation as Judge Knox might reasonably suggest. It is our thought, however, that under no circumstances should any compensation so fixed be less than $50,000.

"* * * It will not be necessary to allocate compensation between us. We have arranged that between ourselves."

Attached to the letter to the Trustee are three statements; one is a joint declaration of Frank Brooks and George Harvey; the other is that of John E. Longua.

The first of these may be summarized as follows:

That, for more than a year prior to August, 1947, they had been in touch with Mr. Hilson of Wertheim & Company with respect to refinancing the mortgage lien upon the debtor's real estate. On or about August 4, 1947, they saw a news item to the effect that this court had requested that persons interested in reorganizing the debtor should submit their proposal within a period of ten days. They got in touch with Mr. Hilson, who requested them to call on him, and this they did. Mr. Hilson expressed the hope that the Court would approve the plan that Wertheim & Company had in mind, but that, if this should come about, a new first mortgage of $16,000,000 would be required. He then requested Messrs. Brooks and Harvey to proceed with negotiations to procure a loan in the amount desired.

After talks that Mr. Brooks had with various lending institutions, he learned that the John Hancock Mutual Life Insurance Company might be interested in lending money on the security of property known as 120 Broadway. Messrs. Brooks and

Harvey, thereupon communicated with Sydney N. Rogers of Urban Servicing Company, a New York concern that has to do with looking after certain requirements of the insurance company with respect to other mortgages in and about New York. On August 6, 1947, after making arrangements with Mr. Duncan for an inspection of the real estate in question, Mr. Harvey, Robert D. Bernheim and John E. Longua spent the day with representatives of the insurance company in going through the Equitable Building, and in examining documents relative thereto. During the progress of these proceedings, Mr. Duncan visited the property and was introduced to the insurance company officials. Mr. Duncan instructed his manager at the building to give free access to all pertinent material in their possession, whereupon Messrs. Brooks and Harvey, together with Mr. Lott of the Trustee's staff, itemized the tenancies of the building and attended to other similar details. Thereafter, the statement continues, Messrs. Brooks and Harvey "in collaboration with Urban Servicing Company, obtained from Hancock Company a written commitment for a new mortgage of $16,000,000, which was delivered and submitted at a court hearing during the month of August. As a further result of these efforts, and after various conferences, the proposal for the new loan was modified in certain particulars, and the amount reduced to $14,750,000. * * *"

The statement of Mr. Longua consists of a number of diary entries in which are recorded many notations having to do with his negotiations concerning the procurement of the John Hancock mortgage. Some of the more important recordings are these:

On August 5, 1947, Longua had a telephone conversation with Mr. Schanzer, who was associated with Mr. Duncan in a legal capacity. Longua told Schanzer that he and his associates felt certain that they could get an approval by the insurance company on the general terms that had been discussed. Schanzer pointed out that any such mortgage would require the approval of the Court, the Trustee and the S. E. C., as well as that of the stockholders. His opinion was that, of the two

proposals then before the court, the Wertheim plan would be found to be the more feasible. Thus encouraged, Longua and a Mr. Rogers engaged in telephone conversations with Mr. Miner of the Hancock Company. The latter sounded out the feeling of Mr. Magee and others connected with that organization. They seemed favorably disposed and Longua and his associates arranged for the inspection of the premises on the following day.

On August 7, Longua, accompanied by Robert Bernheim, went to Boston to present the matter to the insurance company in a preliminary way. They spent their time in going over the details of the Wertheim plan, discussed the possibilities of the property, its income and the like in preparation for the presentation of the proposal to the company's finance committee.

On August 12th, that committee approved a loan for $16,000,000 on the terms set forth in a commitment delivered at that time to Wertheim. On August 22, Schanzer telephoned to Longua and said that the $16,000,000 deal was not acceptable to some of the parties whose approval was necessary. He further stated that the Trustee believed, after a conference with Wertheim and others, that a mortgage of between $14,500,000 and $15,000,000 would be acceptable at an average interest rate of about $3\frac{3}{4}\%$ and a low foreclosure line, the loan to be for 20–25 years, the first three years without amortization contingent upon earnings. Longua told Schanzer that a mortgage on those terms could probably be effected. Schanzer replied that Duncan was then in Boston and inquired if Longua and his associates would have any objection if Duncan were to call on the Hancock officials for the purpose of discussing the matter, and if not, Schanzer would like Longua to arrange for such an appointment. This was assented to, and a meeting between Duncan and Magee was arranged. Late that afternoon, Longua received word that Duncan had not called on the company's officials up to 4:30 o'clock p. m.

On August 25th Schanzer telephoned Longua and said that Duncan had reached the company's offices at 4:30 o'clock and had found them closed. The next day, a Saturday, Duncan went again to the com-

pany's place of business and once more found it closed. Schanzer further said that Duncan would make an appointment to call on the officials of the company at a later date. The following week arrangements were made for Duncan to meet Longua in Boston on September 2nd and go with him to the insurance company.

On that date, Duncan met Longua and Rogers in their quarters at the Ritz Hotel. After having had breakfast together, the party went to the Hancock company's office, where Duncan was introduced to a considerable number of the company's officials. Practically the whole day was spent in discussing the particulars of the proposed loan. At the conclusion of the conference, Duncan said that he would talk with Wertheim with a view to getting him to agree to a deal along the lines that had been discussed.

The next day, September 3rd, Duncan told Longua that some aspects of the matter were not satisfactory to Wertheim. Thereupon, Longua arranged that Duncan should again confer with the Hancock group on September 5th. On that day, Longua and Duncan went to see Mr. Magee. After the discussions then had, tentative agreements were reached with respect to the mortgages. At Longua's suggestion, Duncan was invited to appear before the company's finance committee in order to answer such questions as might be asked concerning the debtor's property and the reorganization proceeding. The same day, the Finance Company approved the loan. Duncan was so advised and said he would endeavor to get the approval of Wertheim and Berner so that the final plan could be proposed at the next hearing in the reorganization which was set for September 10th.

On the evening of September 6th, Duncan telephoned Longua at his home. The Trustee then stated that, as a result of his talk with Wertheim, $14,750,000 would be required, and that the "if earned" provision for additional amortization was still too cumbersome, and asked what could be done about it. After a lengthy discussion, Longua finally said that he thought arrangement could be made to get an approval of the loan at $14,750,000 with constant payments of $800,000 and no additional "if earned" amortization. Duncan said he hoped the interest rate could be made 3.70% for the first three years, instead of 3¾%. Longua promised that this suggestion would be taken up with Hancock company. He also promised, at Duncan's request, that he would endeavor to have the latter speak with Paul Clark, the president of the Hancock company, with regard to the interest rate.

On September 8th, Longua telephoned Magee and advised him of the new turn of events. The latter agreed to recommend to the finance committee that the new arrangement be approved and also to request Mr. Clark to be available for the purpose of receiving a telephone message from Duncan.

The next day Longua talked over the telephone with Duncan as to whether or not the trustee could talk with Mr. Clark. Apparently, the talk took place. The same day the proposed loan, on the terms discussed between Longua and Duncan on September 6th, was formally approved by the Hancock's finance committee. A representative of the company flew to New York and delivered the desired commitment, addressed to the court and to Mr. Duncan, to Longua, or one of his associates. On September 10, Longua delivered the commitment to Duncan upon the understanding that it would not be presented to the court until there was positive assurance that the Wertheim plan would be submitted to the shareholders of the debtor. Without further discussion of the details of the proceedings, it will suffice to say that the loan was closed in accordance with this commitment of the Hancock company.

At the hearings on the applications for allowances, the foregoing recital of facts was supported by the testimony of some, if not all of the present petitioners. At that time, Duncan was in Europe and his testimony, therefore, was not then available. Nevertheless, having been advised of the letter sent to him by Brooks, Harvey & Co., Inc., and Urban Servicing Company and of the foregoing statements of Brooks, Harvey and Longua, in support of their applications for an allowance out of the debtor's estate, Mr. Duncan proceeded to execute an affidavit, dated April 9, 1947, in which he

gives his version of the events that led up to the procurement of the mortgage in question. That affidavit was admitted in evidence on the hearings. Its contents may be summarized as follows:

From the outset of these proceedings, he was of the belief that the first mortgage on the debtor's property that was held by Equitable Life Assurance Society of the United States should be reduced in its principal amount, and that more favorable terms with respect thereto should be obtained.

Inasmuch as the Equitable Society had declined to liberalize the terms of its mortgage, he endeavored to obtain a first mortgage in a reduced principal amount, and upon better terms, from other sources.

For many years, Mr. Duncan had been an acquaintance of Eli Whitney Debevoise, Esq., a well known and highly respected member of the Bar of this court. As a matter of fact, both Duncan and Debevoise are co-directors upon the Board of some corporate enterprise. Some years ago, that company borrowed a considerable sum of money from the John Hancock Life Insurance Company. In that transaction, Mr. Debevoise represented that company. He has also represented it in other transactions in New York City.

In February of 1947, Duncan inquired of Debevoise if he could ascertain whether the Hancock Company would be interested in making a loan on the security of the debtor's real estate at 120 Broadway.

Shortly thereafter, a day or two perhaps, Debevoise told Duncan that the Hancock Company was interested, and it sent a representative to confer with the Trustee. The situation of the debtor was then discussed, and Duncan supplied the company with information relating to the debtor's affairs. At or about this time, certain litigation having to do with the debtor's 1946 plan of the reorganization was pending in the Supreme Court of the United States. Pending a determination of the issues involved in such litigation, the Hancock Company decided to await the outcome.

By August 4, 1947, when Messrs. Brooks & Harvey state that Mr. Hilson, of Wertheim & Company, requested them to obtain a new first mortgage to enable them to effect certain financing of the plan that that organization had in mind, the litigation to which reference has been made, had been concluded.

For the moment at least, I shall quote from Mr. Duncan's affidavit:

"They (Brooks & Harvey) mention the fact that arrangements were made with me for representation of the insurance company (Hancock) to make an inspection of the building and that I came to the building and that they introduced * * * the Insurance Company representatives * * * I went to the building when I gave access to Messrs. Brooks and Harvey to obtain certain information which they wanted to enable them to comply with the request of Mr. Hilson. I told them that I had already been in touch with the insurance company and I tried politely to inform them that I did not need the services of any broker to obtain any mortgage from that Company. I was told in reply that these men were working for Wertheim & Company, which I already knew. Subsequently, as this Court knows, in connection with an underwriting bid of Wertheim & Company, one of the terms of the financing by that firm was a proposed $16,000,000 loan by the insurance company in the form of a bond financing in which the insurance company was to participate, and which was not a first mortgage transaction. As the Court also knows, this proposal was not satisfactory and was not adopted.

"Having thus failed in their attempt to obtain a satisfactory proposal from the insurance company, Messrs. Brooks and Harvey again communicated with me and asked me to afford facilities of the corporation's offices for additional information to enable them to endeavor to obtain a mortgage from other sources and, in a conversation when such facilities were asked from me, I again told them that I did not need their services for any business with the insurance company. The reply made to me by either Mr. Brooks or Mr. Harvey, I am not sure which, though the gentleman in question is a large rather stout fellow, was of an unprintable nature regarding the insurance company and to the effect that he did not wish to have anything more to do with that insurance company because of its refusal

to vary the terms of its $16,500,000 corporate financing proposal above mentioned and which was unacceptable in the proceedings. This gentleman told me that he intended to go to other companies and have nothing further to do with the insurance company.

"As Mr. T. Roland Berner's proposed financing involved an $18,000,000 first mortgage by the New York Life Insurance Company, which I considered dangerous for the Corporation, I decided to make strenuous efforts myself to obtain the approval of the insurance company to a smaller mortgage and I thereupon made arrangements to go to Boston to interview the officials who had * * * expressed a willingness, in February, 1947, to consider a first mortgage on the corporation's properties. As I was about to leave for Boston, Mr. Irving Schanzer, one of my partners, mentioned to me that the insurance company had permanent representatives in New York, and that one of them was a Mr. John Longua. Mr. Schanzer asked me if I would talk to Mr. Longua and give him my ideas of the kind of first mortgage that I would like to see the Corporation obtain. I told him I would do so and, at my request, Mr. Schanzer submitted to Mr. Longua some of my thoughts, and I was told by Mr. Shanzer that Mr. Longua had stated that he believed by ideas could be met, and that he, Longua, would like to meet me in Boston when I called upon the officials of the insurance company. I was then under the impression that Mr. Longua was an employee of the insurance company and when I subsequently met him * * * in Boston, he stated to me that he was the New York representative of the insurance company servicing all their mortgages in the New York area. He did not say anything to me about being a broker or in any way mention the fact that he was trying to represent me in any application I might make to the insurance company. When I called at the office of the insurance company, I first met with Mr. Magee who had previously written me from Boston, and when I submitted my proposal to Mr. Magee, and his associate Mr. Minor, and later to Mr. Clark, President of the insurance company, and the Committee of Directors

before whom I personally appeared, I never received any indication that Mr. Longua was acting as other than the New York representative of the insurance company. Had I done so I would have promptly stated that I knew of no arrangement whatsoever between Mr. Longua and Brooks, Harvey & Co., or anyone else for the obtaining of a loan * * * from the insurance company. The first time that I heard that * * * Brooks, Harvey & Co., Inc. were associated with Mr. Longua's firm was in open court * * * when Mr. Rickaby informed the court that Brooks, Harvey & Company and Urban Servicing Company * * * were associated together.

"I have read Mr. Longua's statement which also refers to the $16,000,000 corporate bond issue which * * * was rejected. Where Mr. Longua states that under date of August 22 he was told by Mr. Schanzer that I as trustee believed after conference with Wertheim and others that a mortgage between $14,500,000 and $15,000,000 would be acceptable and that Mr. Longua felt he could arrange such a mortgage. I desire to point out that I was endeavoring * * * to arrange a mortgage of $14,500,000 as my idea of a proper mortgage without any conference with Wertheim or anyone else, and that when I obtained in Boston the offer of a mortgage of $14,500,000, which was subsequently increased to $14,750,000, I submitted it to the court as available to any one who desired to use it * * *. and not as available to Wertheim & Co. I call attention that under this date of August 22nd in Mr. Longua's note * * * he says: 'I told him (Schanzer) we felt we could arrange such a mortgage * * * he then stated that Mr. Duncan was that day in Boston and wanted to know whether we would have any objection to his calling on Hancock and discussing the matter.' Obviously, I never went to Boston to call up Mr. Longua in New York to ask him whether he had any objection to my calling on the insurance company. I had already gone to Boston to discuss with the officials the mortgage negotiations which I had started in February, 1947.

"As the court knows, I submitted to this court the proposal * * * addressed to

me * * * after two trips to Boston and personally appearing before the committee of directors and obtaining the mortgage * * *. Mr. Clark, the President of the Insurance Company, has told me * * * that except for me his company would never have made any mortgage.

"I do not wish the court to think I am not grateful * * * that Mr. John Longua met me in a room with the other officials of the insurance company at the time I was discussing the terms I wished to obtain and * * * I was happy to meet him and discuss the subject with him. However, I was then under the impression that he was the New York representative of the insurance company. I did not know that he was acting for his own company nor that he had any connection with Brooks, Harvey & Co., Inc. If the court wishes to make an allowance to Mr. Longua personally for his services in meeting me in Boston and attending two conferences, I can make no objection thereto but I feel that any application * * * by Brooks, Harvey & Company is entirely unwarranted."

There is another phase to the matter under discussion and it is this:

On July 14, 1947, Harry R. Amott, Chairman of the Amott Committee of Debenture Holders, telegraphed to James H. Magee, Manager of the City Mortgage Department of the insurance company and said: "* * * would like an offer good until November 1 for new mortgage loan of. $15,000,000 carrying 3.6 percent interest and amortization of $318,750 annually. * * *"

Three days thereafter, Mr. Magee wrote a letter to Mr. Amott, from which I quote: "* * * Inasmuch as the inquiry to the Committee was in tentative form, the Committee took no formal action in respect to it, but did express its interest in giving the matter further consideration upon presentation of complete details."

Mr. Magee also said that the insurance company then had in its possession certain material relating to the Equitable Office Building. This, apparently, had been supplied by the Trustee in or about February, 1947, at which time the insurance company clearly expressed its interest in the proposed loan.

From the foregoing recital, it is obvious that the present petitioners are not entitled to a finders' or brokerage fee for locating a concern that was willing to loan money on the security of the debtor's real estate. Much, if not all, of the ground work looking to the new mortgage had been laid long prior to the time at which petitioners came upon the scene, and proceeded without authority to expend their efforts on behalf of the trustee.

Whatever may have been petitioners' relationship to Mr. Hilson of Wertheim and Company, it was in no wise binding upon the trustee, and so far as their relationship with the trustee is concerned it is to be borne in mind that Mr. Duncan, without the express sanction of the court, was without authority to obligate this estate for the payment of brokerage fees. This is a circumstance concerning which petitioners were either aware, or should have known. If they expected to be paid the brokerage commission now claimed, they should, at the outset, have clarified their status, and asked that it be approved by the court. Their failure to take these steps can not now be disregarded. The court was not advised that petitioners would here seek compensation until long after it had given approval to the new mortgage, and had done so upon the understanding that no brokerage fee was involved. Otherwise the parties in interest would have been heard upon the question as to whether, in view of the brokerage claim, the mortgage should be accepted.

For these reasons, the petitioner's request for compensation, upon the theory that they are rightfully entitled to commissions, must definitely and finally be rejected.

Nevertheless, it is possible that Mr. Longua, as has been suggested by Mr. Duncan, performed some services that tended to facilitate the final consummation of the mortgage transaction, and at a period when time was of the essence. Upon the assumption that this was the fact, I shall award him the sum of $10,000. The statement made on behalf of petitioners that the services so rendered are worth a minimum of $50,000 is one that I cannot entertain for

the shadow of a second. That sum is out of all proportion to allowances that are here being made for work done by other persons, and which has extended over a period of almost seven years. If Mr. Longua wishes to share his allowance with his associates, he may do so. So far as the court is concerned, it declines to recognize that Longua's associates are entitled to compensation. In the memorandum which I filed on December 29, 1948 I inadvertently indicated that this allowance was being made to Brooks Harvey & Co., Inc. and Urban Servicing Company. That memorandum is modified in accordance with this opinion.

Application of Thomas E. Huser, Trial Counsel for the Trustees in the Trial of Certiorari Proceedings in the Supreme Court of the State of New York With Respect to Taxes and Tax Assessments Upon the Debtors Property.

This matter of taxes was of prime importance to the debtor. As a matter of fact, the City's persistence in placing excessive valuation on the real estate at 120 Broadway was one of the incidents that brought about the necessity for this administration.

Shortly after the trustee had qualified, Mr. Duncan interested himself in the tax situation. He had numerous conferences with members of the City Tax Board, and finally carried his ideas to the late Mayor LaGuardia.

In the early part of 1944, the City made an offer to compromise the disputes between it and the trustee. In substance, the offer was this: The City offered a refund of $500,000, plus a saving of $19,760 by virtue of a tendered reduction in the tax assessment for the year 1943-4.

This offer, it was thought, could be materially improved by litigation, and, after hearing, the trial of the certiorari proceedings against the City was authorized. On April 7, 1944, Thomas E. Huser, a man of long and varied experience in this type of litigation, was retained as trial counsel for the Trustee.

Mr. Huser proceeded to acquaint himself with the problems before him and, in prepa-

ration for trial, sought and obtained the expert assistance that he thought desirable. The applications of the several persons who contributed such services will be dealt with hereafter.

Petitioner, so far as his own preparation is concerned, had this to say: "It became necessary, on account of the magnitude of the property and the voluminous character of all of the data which had to be assembled and prepared, for petitioner to give a very large portion of his time for over a year to the preparation and trial of this case."

That the task to be performed by Mr. Huser and his office staff, and other assistants, was both tedious and tremendous, stands admitted. For this reason, no purpose will be served by detailing the preparations that were required. Apparently, however, the trial of the proceeding required but three days, November 2, 22, and December 15, 1944.

In essence, the results of the litigation were these: The total reduction in assessment value for the years 1935 to 1944 was $21,200,000. All in all, the refunds of taxes recovered from the City, together with interest thereon, aggregate $743,936.27. Other benefits, by way of savings, are said to be the equivalent of about $200,000.

For services rendered by himself, and his office staff, petitioner asks that he be paid $60,000, plus expenses of $1,904.

Before reaching a decision upon the merits of this application, I think it appropriate to sketch other applications for allowances that grew out of the certiorari proceedings.

Application of McNamara & Seymour, Associate Attorneys for the Trustees.

These attorneys, it will be recalled, had long been the attorneys for the debtor, and thus familiar with its tax difficulties. For this reason, they continued to render services in the certiorari proceeding. That their prior experience and participation in the effort to obtain tax refunds and reduction in assessments were helpful and beneficial may be conceded.

According to the calculations of these petitioners, the advantages resulting from the tax litigation was the equivalent of a

gross gain over the City's offer of compromise of $224,170.87.

The time that members of this firm contributed to certiorari cases amounted to 1390 hours.

For this service thus performed, petitioners ask a fee of $40,000, and a reimbursement for expenses in the sum of $43.92.

### Application of Robert R. Armstrong.

The petitioner, pursuant to court order, dated April 7, 1944, was retained by the trustee to prepare an appraisal report, and to testify as a real estate expert in the State Supreme Court with respect to the tax matter.

Mr. Armstrong calls attention to the fact that, due to his own experience and qualifications as an expert, he was not required to retain other experts to estimate rental values and operating costs, in order to equip himself for his examination in court. This indicates, or implies, that the estate was thus saved additional expense. Furthermore, he does not seek reimbursement for expenses, as such, the same being included in his office overhead.

Petitioner is well and favorably known to the court, and I am satisfied that his testimony contributed to the results obtained. He asks for an award of $19,500.

### Application of George A. Hammer, Walter J. Cashel, H. S. Ford and O. J. Gette.

The three persons, first named above, are officers and employees of Charles F. Noyes Company, Inc., a large and prominent real estate firm in New York City. They were employed to make separate appraisals, and to testify as experts in the certiorari trial.

O. J. Gette is an architect, who was separately employed to testify in the proceeding, and did so.

For the services performed by these petitioners, I am requested to make the following awards:

To
Messrs. Hammer, Cashel and Ford, as a group............ $50,000
Mr. Gette ................... $16,000

If the compensation asked by the several participants in the certiorari cases were to be fully granted, the cost of the tax litigation, aside from expenses, would be $185,500. When this sum is set off against an alleged gross benefit to the estate of $224,176.87, the net value of all that was done would appear to be $38,676.87.

If this latter sum is the only gain that has accrued to the estate through all the effort, time consumption and energy that were required in litigating the tax claims, the flame of the proceeding can hardly be said to have been worth the candle that was burned.

The applications, now under discussion, first came before me on November 16, 1945. They were again discussed in court on December 6, 1945. They were further argued in June of this year. On January 23, 1946, I granted interim allowances to petitioners as follows:

| | Fees | Disbursements |
|---|---|---|
| McNamara & Seymour | $12,000 | $ 43.92 |
| Thomas E. Huser..... | 20,000 | 1,904.00 |
| George A. Hammer, Walter J. Cashel, H. S. Ford ............ | 15,000 | 634.98 |
| Robert H. Armstrong.. | 5,000 | ..... |
| O. J. Gette .......... | 7,500 | 206.40 |
| | $59,500 | $2,789.30 |

At that time I also granted Robert A. Meagher a final allowance of $925, plus disbursements.

My present task is to fix the final allowance of the above named petitioners, excepting Mr. Meagher. In my attempt to reach a conclusion, I have read the arguments that were made on these applications in November and December of 1945. I have also considered the arguments, together with the testimony offered by Mr. Huser, in the Spring of the current year.

To what has already been said. I should add that both the Trustee and the Commission are strongly of the opinion that the interim allowances of January 23, 1946 should stand as final awards. They also point out that the debtor, at its own expense, and at a cost of about $15,000, furnished needful data to the attorneys who handled the certiorari proceedings. Whether this expenditure be treated as overhead of the debtor, or otherwise, it is an expense that was occasioned by the litigation.

Without further discussion, each of the fees heretofore allowed to Mr. Huser and to McNamara & Seymour will be increased by fifteen percentum. In other words, McNamara & Seymour may have an additional $1,800 and Mr. Huser a further sum of $3,000. There will be no increase in the fees of any of the other applicants.

While these applications were sub judice, Mr. Huser died. As a result, the allowance which would have been paid to him, will be paid to the appropriate representative of his estate.

Application of Sydney Bernheim, Who, as Attorney for John Hancock Mutual Life Insurance Company Represented That Institution Upon the Closing of the Reorganization Mortgage of $14,750,000.

One of the terms having to do with the procurement of the above mentioned mortgage was as follows: "6. That any and all expenses, including but not limited to title insurance, in connection with this loan and the closing thereof are to be borne by the borrower (Debtor)."

The services rendered by this petitioner included "title examination; conferences with counsel for Title Guarantee & Trust Company and Lawyers Title Corporation of New York, in connection with title reports, telephone conversations with counsel for John Hancock Mutual Life Insurance Company; conference with attorney for Trustees; preparation of closing papers; conferences in connection therewith with counsel for the insurance company; attendance at closing of mortgage transaction on November 1, 1947, and various telephone conversations and correspondence."

For the work thus performed, Mr. Bernheim asks that he be awarded a fee of $2,500 together with disbursements of $130.28. When the size of the mortgage transactions is taken into account, along with the degree of responsibility assumed by petitioner, the sum requested, if that were all, would be well within the range of reason and professional modesty.

The Securities and Exchange Commission nevertheless opposes the application upon the grounds specified by Mr. Finnigan in the following words:

"Mr. Bernheim has already received $4,500 because he got the commission (from the title insurance companies) when they ordered the title policies. Your Honor will recall that one of the conditions for the issuance of the mortgage was that the Equitable Office Building title be insured for the first time in its history, and the two insurance companies paid him a commission whose percentage I do not now recall, but the sum total of his compensation was a dollar or two in excess of $4,500 which, in the opinion of the Commission is not only adequate, but generous compensation for the limited time he was compelled to spend in closing the title on this property.

"The Commission feels that he should receive no further allowance from this court."

Mr. Bernheim's position is that the commissions paid to him by the title insurance companies were not paid by the debtor and that the same were not meant to benefit anybody but the attorney. In addition, it is said that under the Insurance Law of the State of New York a title company is permitted to "pay a commission to a licensed real estate broker or to an attorney and counsellor-at-law for procuring business for such corporation."

Sec. 440, subd. 2 of the Insurance Law, McK. Unconsol. Laws, c. 28.

Petitioner also calls attention to Section 188 of Article Eight of the Insurance Law providing, inter alia, as follows: "No authorized insurer * * * shall directly or indirectly; by giving or sharing a commission or in any manner whatsoever, pay or allow * * * to (the) insured or to any employee of such insured, either as an inducement to the making of such insurance or after such insurance has been effected, any rebate from the premium which is specified in the policy * * *."

The purpose of these enactments, it is argued, was to permit a title company to pay a brokerage commission to an attorney who at the same time, and in the same transaction, will also be compensated by his client for his legal services. It is further said the payment for the brokerage services is not to be regarded as a payment for legal services. In other words, peti-

tioner's contention is that the State Legislature, in drawing Section 440 of the Insurance Law, intended to change the law of principal and agent, and to authorize an attorney to act for a title company in a transaction in which he also represented a client, and thus permit the attorney to receive a commission from a title company, and to retain such commission as against his client. Indeed, I am told, that, even if petitioner desired to credit the debtor or his client with the commission received from the title company, he could not lawfully do so in view of Section 188. It is also averred that "To uphold the contention made by the S.E.C. to regard the commission received by the petitioner as payment for his legal services, would be to require the petitioner to grant a rebate, which is expressly prohibited by Section 188."

It is interesting to note, with respect to petitioner's contentions, that the problem now presented has heretofore received the attention of a Committee on Professional Ethics of the New York County Lawyers' Association. See page 519 of Costigan's Cases on Legal Ethics. The question propounded to the Committee was this:

"Is it improper for an attorney to accept any commission or rebate from the charges of printers, stenographers or other persons serving the legal profession for work or services performed in litigation, or in other matters in which his client is interested,

"(a) Without first revealing his intention so to do to his clients;

"(b) Even with his client's knowledge and consent?"

The Committee answered: "So long as the saving thereby effected is placed to the credit of clients' account with the attorney and the client is advised thereof, the Committee sees no impropriety in the course suggested. The vice lies in concealment from the client."

Furthermore, the question presently before me was considered by the Chicago Bar Association at its annual meeting on June 29, 1910. On that occasion, a resolution to the following effect was formally adopted:

"Whereas, abstract companies in rendering abstracts of title policies furnished on the word of an attorney, make a gross charge from which, if the bill is paid within a certain time, a ten per cent rebate is forwarded to the attorney * * *

"Be it resolved * * *

"(1) That it is unethical for any lawyer to fail to account for any rebate or commission received by him, whether of the nature particularly referred to in the preambles hereof or of any similar or kindred nature * * *"

Many years ago, at a time when I was actively engaged in closing titles of New York City real estate, I had frequent occasion to observe the practice of Bowers and Sands, probably one of the most prominent firms in real estate practice in this city, with respect to commissions received from title companies. To the best of my knowledge and belief, that firm invariably credited such commissions upon the bills rendered their clients.

For the foregoing reasons, I am satisfied that this is what should have been done by this petitioner. Had he done so, it is entirely probable that his client would have been required to pay no additional fee. The sum of $4,500, certainly, was entirely sufficient to compensate Mr. Bernheim for both his fee and expenses. It is to be noted, additionally, that the claim here made is not an express claim of the insurance company with which the agreement for the mortgage was made, but is advanced by one of its representatives who has generously been compensated.

Petitioner's application is denied.

## Application of Barrows, Wade, Guthrie & Co.

■ This firm of accountants and auditors, upon the confirmation of the 1946 plan of reorganization, was retained by the new company that was to take over the debtor's assets to perform such accounting services as were required to register its stock with the Securities & Exchange Commission, and to have the securities listed on the New York Stock Exchange.

As respects this application Mr. Finnigan spoke as follows: "We have discussed the matter with a partner of the firm * * * and we are convinced that the time alleged to have been spent which I believe is 65 days, was spent by a number of persons,

and that is why the number of days is as high as 65. They did not have more than three weeks to do the work, and it was skillfully performed, and it was the kind of work which required a degree of skill higher than that ordinarily involved in the auditing of a company's books, or something of that kind. We believe that the amount requested, therefore, of $3,500 is not unreasonable, and we do not object to it."

No objection from any source was voiced at the time of hearing. The work done was admittedly necessary and performed under pressure. I think the amount requested is not out of line with the going costs of such work. For this reason, this application will be granted.

In closing this opinion I would in my judgment be quite remiss if I did not express my appreciation for the aid and assistance that have come to me from Mr. Finnigan and the other members of the staff of the Securities and Exchange Commission who participated in this intricate and involved administration. Their capacity and skill was nothing short of invaluable.